BACON *v.* WALDEN.

1. RES JUDICATA — CONCLUSIVENESS — JUDGMENTS — INJUNCTION—
WATERS AND WATERCOURSES.

Where an injunction was granted in a suit to determine
the right to maintain a dam at the outlet of Walloon
Lake, to which cause defendant was not a party, although
he owned property which was affected by the decree,
he was not concluded by the decree of the court.

2. WATERS AND WATERCOURSES—LAKES—DAMS—RIPARIAN RIGHTS
—INJUNCTION.

*Held,* that conflicting evidence relative to the height of a
dam sustained a decree determining that the dam of de-
fendant caused the lake to rise above the point at which
he was entitled to maintain it.

Appeal from Charlevoix; Lamb, J., presiding. Sub-
mitted January 27, 1915. (Docket No. 60.) Decided
June 7, 1915.

Bill by Henry Bacon and others against Samuel D.
Walden for an injunction. From a decree for defend-
ant, both parties appeal. Affirmed.

*Harris & Ruegsegger,* for complainants.

*Halstead & Halstead,* for defendant.

STEERE, J. Complainants, riparian owners of cer-
tain particularly described lands in the counties of
Emmet and Charlevoix bordering upon Walloon lake,
filed this bill in the circuit court for the county of
Charlevoix, in chancery, to secure a judicial deter-
mination that the natural level of said Walloon lake
at its outlet is the original floor of the so-called Mc-
Manus dam, and to obtain a perpetual injunction re-
straining defendant from impounding the waters of
said lake to a higher level, which was causing more

or less damage to the lands of complainants by flood-
ing.

The suit was heard upon pleadings, and proofs
taken in open court, in July, 1913, and resulted in the
entry in that court of a decree establishing the water
level at a point ten inches below the level of the dam
as maintained by defendant at the commencement of
the suit. About two months subsequent to the hear-
ing, defendant Walden departed this life. The suit
was duly revived and an appeal taken to this court
in the name of his administrator. Complainants
thereafter took a cross-appeal.

Walloon (formerly Bear) lake is an attractive body
of water situated in both Charlevoix and Emmet
counties, and is irregular in outline, consisting of two
connected parts or arms. It lies in an elevated basin
about 80 feet above the level of Lake Michigan, near
and to the south of Little Traverse Bay, surrounded
by rugged hills, has a comparatively limited tributary
watershed, the extent of its drainage area being
about 42 square miles. It is fed principally by
springs and rainfall, a number of small streams also
emptying into it. The larger arm is about 12 miles
long with an average width of 1½ miles, while the
northerly and smaller arm is about 3½x½ miles in
extent. The outlet is at its southeastern extremity,
where it empties into Bear creek (or river), through
which, curving to the north, its waters meander into
Little Traverse bay at Petoskey, some 8 miles dis-
tant. The location, beauty, and attractive environ-
ments of this lake are such that since about the year
1875 it has been recognized and more or less fre-
quented as a summer resort for health and pleasure,
assuming increasing importance in that respect. To
that end private cottages, boathouses, and docks have
been built at places along its shores, while craft to
navigate its waters and places for public accommo-

dation and entertainment have been provided. So far as indicated the great, if not the only, disturbing element to the peace and pleasure of those who dwelt or resorted there was the level of this lake which, either through natural causes or by the industry of man, has at times risen and fallen, thereby contracting and expanding its littoral outlines to the serious confusion and inconvenience of those who sought to dwell upon its shores. This has been ascribed by parties affected to the erection and manipulation of a dam, or dams, at the outlet of the lake at the head of Bear creek, by those owning or controlling the shore at that point, from which has resulted contention and litigation since 1902. The suit of Hass and 17 other shore owners, with summer homes upon the lake, against McManus and associates, owning and controlling the so-called McManus dam, extended over a period of about 7 years and was finally decided by this court in May, 1910. *Hass* v. *McManus*, 161 Mich. 372 (126 N. W. 462). A comparison of the ample records in that case and this discloses that descriptively and historically they cover the same ground up to the time of trial of the former suit, and reference may be made to that opinion for a general outline of the situation up to that date. There as here the issues involved were changes in the level of the lake, and their causes. In that litigation was involved also the question of manipulation of the level by defendants in the use of flashboards to regulate the overflow of their dam.

After the *Hass Case* was finally decided in this court, the use of all flashboards was abandoned, and in the summer of 1910, McManus proceeded to repair and reconstruct the dam, changing it to a flume giving steady outflow, and used the sill of the old dam for the sill of the flume in compliance with the decision as claimed by complainants, although de-

fendant denies that the level of the old sill as then found was retained. Following this, whatever the cause may have been, the level of Walloon lake fell materially and increasing complaints of low water were made. The evidence produced by defendant disclosed that the water lowered about 19 inches that season, leaving a margin around the lake, which had before been always covered by water, bare to a width varying from 30 to 100 feet, and the last condition of those who dwelt upon its shores was worse than the first. This resulted in a suit, begun in Charlevoix circuit court in chancery early in the summer of 1911, by Henry S. Jordan and 42 other complainants against McManus and others to compel a reconstruction of the dam which would raise the level of the lake 18 inches above the then level of the dam or flume. This suit progressed to a hearing, but was settled before the hearing was concluded, and dismissed by stipulation; Walden, defendant in the present case, at that time purchasing from McManus and associates the land upon which the dam was located at the outlet of the lake for $5,000. Shortly thereafter, having first obtained written consent from all complainants in the *Hass Case*, defendant, aided by his associates, constructed, with concrete, part of the present flume, raising its level 26 inches above the sill of the McManus dam, retaining at that time the original width of 14 feet, and completed it the following spring by extending the sill 21 feet, making a flume 35 feet wide.

Claiming that defendant by this change had raised the waters of the lake from 26 to 30 inches above the natural level and flooded their lands, complainants filed this bill in July, 1912. In connection with the hearing an inspection of conditions at and around the lake was made by the court for a better understanding of the testimony. Thereafter a decision was

filed and decree rendered requiring the sill of the dam or flume as then constructed to be lowered 10 inches within the original 14 feet width, but determining that the 21 feet extension with all other parts and conditions of the dam, both in front and below, should be maintained and remain the same as they existed at the time of taking evidence in the case.

It is urged by complainants that the *Hass-Mc-Manus Case* is a conclusive adjudication of the natural level of the lake at its outlet and directly binding upon defendant Walden, he being in privity with parties to the action in respect to the subject-matter of the litigation, as purchaser of the outlet of the lake from the defendants in that case.

Had the injunction decreed in the *Hass Case* been made unequivocally and irrevocably perpetual, that decision might have foreclosed defendant in this case, but it was not. Although the decree which followed that opinion enjoined defendants from again raising the dam by flashboards or otherwise above the level to which it was directed to be abated, and from allowing the same to get out of repair so as to permit water to escape from Walloon lake at a lower level than the plank flooring of the dam so as to affect the level of the lake, yet, in harmony with suggestions in the concluding paragraph of the opinion, the injunction was not made absolute beyond the possibility of subsequent amicable arrangement between the parties litigant, as appears by the following provision in the decree:

"Their heirs or assigns, unless and except the same be done by and with the express consent, in writing, of the said complainants, or their respective heirs, legal representatives, or assigns, and in such manner as may serve best to maintain a level of the water in said lake during the summer months without interfering with the rights of defendants and others entitled to the overflow of said lake."

For a better understanding of the situation it may be stated that, while properly the sole defendant in this suit as owner of the land at the outlet and legally responsible for the change, Walden's interest and activities were in co-operation with and supported by others, in what was claimed to be an effort to ascertain and restore the natural level of the lake. He had a summer home there and held land as trustee for others. After settlement of the *Jordan-McManus Case* and purchase of the outlet by him, he and his associates, before taking any steps to change the outlet, secured the services of a surveyor and two experts, Professor Hobbs of the Michigan University and State Geologist Allen, to investigate and advise them as to the natural level. Being advised by them that the dam should be raised, and to what extent, Walden then obtained consent in writing signed by the 18 complainants in the *Hass-McManus Case,* dated September 1, 1911, expressly waiving and annulling to the full extent authorized by said decree its provisions restraining elevation of the outlet, distinctly stating their consent as follows:

"We, the undersigned, do hereby consent that the dam or flume at the outlet of Walloon Lake be so far altered as to allow the waters of said lake to be raised to a level of 18 inches above the level to which they are raised or maintained by the dam or flume now in place, or be raised to such other height or level as may, by any competent authority, judicial or otherwise, be determined to be the natural level of the waters of said lake."

Defendant was not a party to that suit and was not as a matter of law affected or bound by the decree rendered in it, except as an adjudication upon some question raised in the case might in a similar suit to which he was a party prove a precedent. He had, however, a summer home upon its shore and owned lands bordering on the lake so that he was,

in common with all shore owners, as a matter of fact, affected by compliance with the injunction on the part of those bound by it when it resulted in a material and permanent subsidence of the level of the lake, as we are convinced the trial court rightly found that it did. The *Jordan-McManus* suit brought by 42 of those affected, including defendant, was begun asking relief from that result and an elevation of the reconstructed dam to raise the water 18 inches. This was resisted. Meetings were held, in which leading citizens of Petoskey, including members of its common council, participated in an effort to adjust this water question and eliminate the friction which had arisen from it. What effect this had is a matter of inference, but the suit was finally settled and dismissed. The terms of the settlement were not in writing and are not in evidence, but it is shown that defendant here bought of defendants in that case the property impressed with the injunction and thereby, as to that property, became in privity with and subject to the restraint imposed on his grantors, at the same time acquiring the same right they had to obtain relief from the injunction and to thereafter alter his dam upon the property which he had purchased, by and with the express consent in writing of the complainants in that suit, "in such manner as may serve best to maintain a level of the water in said lake during the summer months without interfering with the rights of defendants and others entitled to the overflow of said lake." This is what he claims to have done, after obtaining such consent in writing. Under such circumstances it cannot be said that in another suit by other parties with other testimony, though relating to the same subject-matter, defendant is bound, and precluded from his defense by the former decision, even though upon the trial similar facts raising similar questions of law might

186 Mich.—10.

render the former decision more or less of a controlling precedent upon certain points involved. In the former case the court did not determine conclusively the natural average level of the waters of the lake, but from data furnished and testimony then given determined comparative levels of the Olds and McManus dams, affirming the decree of the lower court against artificially holding and raising and then lowering the water at pleasure with flashboards, and requiring repairs to be made upon the existing dam, but reversed the decree in so far as it required defendants to maintain any structure above or higher than the plank flooring of the then present dam. The artificial work done at the outlet and use of flashboards to increase the constancy of flow in the stream, at the same time disturbing the level of the lake, had obscured the question of the natural level, and left an uncertainty as to the result of their discontinuance which led to a suggestion at the conclusion of the opinion and a provision in the decree relative to relief from the injunction by consent of complainants. As the matter is now presented, in view of former manipulation by flashboards, and subsequent developments, we do not think the door was closed by that decision to an investigation of the true and actual level of this lake to ascertain as near as possible where with reference to it the overflow of this dam or flume may be maintained as between these litigants.

In this case as in the *Hass Case* counsel do not disagree as to applicable rules of law, and the controversy is upon questions of fact, although here no question of the rights of a downstream proprietor to use and enjoyment of passing water is involved. While defendant owned the land upon which is located the outlet of the lake and head of the river, like complainants', his interest in the matter was as

a shore owner on the lake, and his work at the outlet was directed to maintaining what he claimed to be the proper lake level.

The trial court recognized and rightly held that defendant was precluded by prescription from questioning any rights which complainants had obtained through long-continued open and notorious maintenance and user of the Olds dam, as constructed in 1889, without flashboards, and continued at substantially the same level by its successor, in so far as the Olds dam, as constructed, had any effect upon the lake level, one season with another, saying in part:

"If the level of the water was affected at all by the Olds dam, as constructed, and if the McManus dam continued that effect, in whole or in part, to that extent rights have become established and the parties hereto have a right to insist upon them and are bound by them, whether that is the natural level or otherwise."

During the 11 years the Olds dam remained, whatever effect it may have had, there does not appear to have been abnormal conditions of the lake level to cause discontent, nor complaint of high or low water, unless affected by the use of flashboards. The McManus dam was built 16 feet nearer the lake, equipped with three flashboard openings, the evidence being, and the trial court finding, that its sill was placed on a level with the sill of the Olds dam; but from the testimony in the present case taken as a whole the court also found that the opportunity for water to pass and actual outlet of the lake was nevertheless materially increased and deepened, except as it was thereafter approximately held to the effect of the Olds dam by flashboards. From the evidence in this record it is difficult to reach any other conclusion.

While it was charged in the *Hass Case* that the lake was being lowered, the chief complaint was of the inconvenience and damage resulting from "ir-

regularity in the level of the waters of said lake, caused by the adding and removal of barriers." The testimony is conclusive that when, in 1910, McManus removed the dam, which was equipped to add and remove barriers, and reconstructed it as a constant concrete flume, on the level of the old sill, the lake fell to an unprecedented low level, resulting in a recession of the water from its old shore lines as it had never done before. McManus himself testified that when he first built his dam he built a brakewater from the outlet along the lake shore for 500 feet, varying, according to the shore line, from 4 to 25 feet out in the lake from the shore water line, alongside of which it was shown that launches drawing 15 inches could usually tie up, but after he built the concrete flume the water line of the lake lacked 15 feet of reaching to the brakewater. This demonstration of lower level directly adjacent to the outlet was duplicated at many places around the lake where shoals appeared and boathouses, brakewaters, boat landings, etc., were left in shallow water or inland, while the larger boats engaged in transportation of passengers and freight were unable to make customary landings at certain wharves, encountered shoals and "dragged mud" in the narrows where they had freely navigated, with abundant water, for years previous. Numerous witnesses, familiar with the lake and its outlines for many years, as far back as 1876, testified positively and with convincing circumstances that the waters had never, since they knew the lake, been so low before. The long and detailed story of the cry of distress, which went up around those shores following the construction of the McManus concrete flume in 1910, settling down to the Jordan-McManus suit, in 1911, seems to fully justify the following conclusion of the trial court:

"I am satisfied, in view of the testimony, and after

a physical examination of conditions at and around the lake and the conditions of the bottom of the lake near the shores, the low water in the years 1910 and 1911 was not a natural normal low water, nor was it such a condition of low water as would result from the use and operation of the 'Olds dam' as constructed and used from 1889 to 1900. This condition of low water, during those years, was the natural result of a physical fact or condition, viz., the stripping of the dam to the sill and the lowering of the outlet at the down river end and cleaning out in front of the flume causing a stronger current of water by a large increase of the draught."

Whether that done to remedy this condition was overdone, and if so to what extent, are the important questions of fact most clearly debatable and difficult to determine. We think the learned chancellor, who heard the case, rightly adopted the Olds dam, as and when constructed, for the starting point and its effect, if any, on the level of the lake as the rule by which to seek the level to which these parties are bound and to which they are entitled. It is evident, as the court stated:

"With the radical change of conditions wrought by time and the elements, aided by man in careful pursuit of his own interest, to now determine with any degree of nicety the actual natural level of the lake is beyond the range of possibility."

Neither would that if ascertained, though helpful in reaching conclusions, be the true test. Neither are the conclusions of the learned geologists, who figured down through the ages from the young world's early dawn to the lake as they found it in 1911, and point out where its natural level should be, though interesting and helpful, conclusive as to where, by the test of the Olds dam and the facts shown in that connection, these parties are entitled to have it maintained, as near as may be. We are well satisfied the evidence preponderates in support of the conclusion reached

by the trial court, that the effect of the Walden dam at the height constructed and as maintained impounds the waters of the lake for longer periods of time and to a greater extent from one season to another than would or did the Olds dam as constructed and maintained without manipulation, and that to produce as near as may be a like effect there should be a relative reduction.

To review the lengthy conflicting testimony with which the respective sides seek to sustain their contentions would be of no general interest or value. Giving due consideration to the instructive expert evidence, necessarily modified by the physical facts as actually shown, we find from this record no reason to disagree with or disturb the conclusions reached by the learned chancellor who, for a better understanding of the evidence and physical conditions as they actually existed and were testified to, inspected the subject-matter of this litigation and its environments. We think the evidence conclusive that the reconstructed McManus dam drew the level of the lake much below where it had ever previously been, within the knowledge of witnesses, under any condition of the outlet, and are well satisfied that the Walden dam exaggerated it in the opposite direction, and conclude that the extent to which it is directed to be modified is warranted by the evidence.

The decree is affirmed and, both parties having appealed, without costs to either party.

BROOKE, C. J., and McALVAY, KUHN, STONE, BIRD, and MOORE, JJ., concurred. OSTRANDER, J., did not sit.