BAKER ET. AL. *v.* GENERAL MOTORS CORP.

No. 96–653.   Argued October 15, 1997—Decided January 13, 1998

224

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SOUTER, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 241. KENNEDY, J., filed an opinion concurring in the judgment, in which O'CONNOR and THOMAS, JJ., joined, *post*, p. 243.

*Laurence H. Tribe* argued the cause for petitioners. With him on the briefs were *Jonathan S. Massey, James W. Jeans, Sr., David L. Shapiro, Robert L. Langdon,* and *J. Kent Emison.*

*Paul T. Cappuccio* argued the cause for respondent. With him on the brief were *Kenneth W. Starr, Richard A. Cordray, Jay P. Lefkowitz, Thomas A. Gottschalk,* and *James A. Durkin.*\*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority of one State's court to order that a witness' testimony shall not be heard in any

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Missouri et al. by *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, and *Karen King Mitchell, Richard Blumenthal,* Attorney General of Connecticut, *Thomas J. Miller,* Attorney General of Iowa, *Scott Harshbarger,* Attorney General of Massachusetts, *Mike Moore,* Attorney General of Mississippi, *Christine O. Gregoire,* Attorney General of Washington, and *James E. Doyle,* Attorney General of Wisconsin; for the Association of Trial Lawyers of America by *Jeffrey Robert White, Cheryl Flax-Davidson,* and *Howard F. Twiggs;* and for the Center for Auto Safety.

Briefs of *amici curiae* urging affirmance were filed for the National Association of Manufacturers et al. by *Mark B. Helm, Kristin A. Linsley, Jan S. Amundson, Quentin Riegel,* and *Todd S. Brilliant;* and for the Product Liability Advisory Council, Inc., by *Stephen M. Shapiro, Andrew L. Frey, Kenneth S. Geller,* and *John J. Sullivan.*

A brief of *amici curiae* was filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, and *Elise Porter,* Assistant Attorney General, *Gale A. Norton,* Attorney General of Colorado, *Jan Graham,* Attorney General of Utah, and *Richard Cullen,* Attorney General of Virginia.

court of the United States. In settlement of claims and counterclaims precipitated by the discharge of Ronald Elwell, a former General Motors Corporation (GM) engineering analyst, GM paid Elwell an undisclosed sum of money, and the parties agreed to a permanent injunction. As stipulated by GM and Elwell and entered by a Michigan County Court, the injunction prohibited Elwell from "testifying, without the prior written consent of [GM], . . . as . . . a witness of any kind . . . in any litigation already filed, or to be filed in the future, involving [GM] as an owner, seller, manufacturer and/or designer . . . ." GM separately agreed, however, that if Elwell were ordered to testify by a court or other tribunal, such testimony would not be actionable as a violation of the Michigan court's injunction or the GM-Elwell agreement.

After entry of the stipulated injunction in Michigan, Elwell was subpoenaed to testify in a product liability action commenced in Missouri by plaintiffs who were not involved in the Michigan case. The question presented is whether the national full faith and credit command bars Elwell's testimony in the Missouri case. We hold that Elwell may testify in the Missouri action without offense to the full faith and credit requirement.

I

Two lawsuits, initiated by different parties in different States, gave rise to the full faith and credit issue before us. One suit involved a severed employment relationship, the other, a wrongful-death complaint. We describe each controversy in turn.

A

*The Suit Between Elwell and General Motors*

Ronald Elwell was a GM employee from 1959 until 1989. For 15 of those years, beginning in 1971, Elwell was assigned to the Engineering Analysis Group, which studied the performance of GM vehicles, most particularly vehicles involved in product liability litigation. Elwell's studies and research concentrated on vehicular fires. He assisted in

improving the performance of GM products by suggesting changes in fuel line designs. During the course of his employment, Elwell frequently aided GM lawyers engaged in defending GM against product liability actions. Beginning in 1987, the Elwell-GM employment relationship soured. GM and Elwell first negotiated an agreement under which Elwell would retire after serving as a GM consultant for two years. When the time came for Elwell to retire, however, disagreement again surfaced and continued into 1991.

In May 1991, plaintiffs in a product liability action pending in Georgia deposed Elwell. The Georgia case involved a GM pickup truck fuel tank that burst into flames just after a collision. During the deposition, and over the objection of counsel for GM, Elwell gave testimony that differed markedly from testimony he had given when serving as an in-house expert witness for GM. Specifically, Elwell had several times defended the safety and crashworthiness of the pickup's fuel system. On deposition in the Georgia action, however, Elwell testified that the GM pickup truck fuel system was inferior in comparison to competing products.

A month later, Elwell sued GM in a Michigan County Court, alleging wrongful discharge and other tort and contract claims. GM counterclaimed, contending that Elwell had breached his fiduciary duty to GM by disclosing privileged and confidential information and misappropriating documents. In response to GM's motion for a preliminary injunction, and after a hearing, the Michigan trial court, on November 22, 1991, enjoined Elwell from

"consulting or discussing with or disclosing to any person any of General Motors Corporation's trade secrets[,] confidential information or matters of attorney-client work product relating in any manner to the subject matter of any products liability litigation whether already filed or [to be] filed in the future which Ronald Elwell received, had knowledge of, or was entrusted with dur-

ing his employments with General Motors Corporation."
*Elwell* v. *General Motors Corp.*, No. 91–115946NZ
(Wayne Cty.) (Order Granting in Part, Denying in Part
Injunctive Relief, pp. 1–2), App. 9–10.

In August 1992, GM and Elwell entered into a settlement
under which Elwell received an undisclosed sum of money.
The parties also stipulated to the entry of a permanent in-
junction and jointly filed with the Michigan court both the
stipulation and· the agreed-upon injunction. The proposed
permanent injunction contained two proscriptions. The
first substantially repeated the terms of the preliminary
injunction; the second comprehensively enjoined Elwell from

> "testifying, without the prior written consent of General
> Motors Corporation, either upon deposition or at trial,
> as an expert witness, or as a witness of any kind, and
> from consulting with attorneys or their agents in any
> litigation already filed, or to be filed in the future, involv-
> ing General Motors Corporation as an owner, seller,
> manufacturer and/or designer of the product(s) in issue."
> Order Dismissing Plaintiff's Complaint and Granting
> Permanent Injunction (Wayne Cty., Aug. 26, 1992), p. 2,
> App. 30.

To this encompassing bar, the consent injunction made an
exception: "[This provision] shall not operate to *interfere
with the jurisdiction of the Court in . . . Georgia* [where the
litigation involving the fuel tank was still pending]." *Ibid.*
(emphasis added). No other noninterference provision ap-
pears in the stipulated decree. On August 26, 1992, with no
further hearing, the Michigan court entered the injunction
precisely as tendered by the parties.[1]

Although the stipulated injunction contained an exception
only for the Georgia action then pending, Elwell and GM
included in their separate settlement agreement a more gen-

---

[1] A judge new to the case, not the judge who conducted a hearing at the
preliminary injunction stage, presided at the settlement stage and entered
the permanent injunction.

eral limitation. If a court or other tribunal ordered Elwell to testify, his testimony would "in no way" support a GM action for violation of the injunction or the settlement agreement:

> "'It is agreed that [Elwell's] appearance and testimony, if any, at hearings on Motions to quash subpoena or at deposition or trial or other official proceeding, if the Court or other tribunal so orders, will in no way form a basis for an action in violation of the Permanent Injunction or this Agreement.'" Settlement Agreement, p. 10, as quoted in 86 F. 3d 811, 820, n. 11 (CA8 1996).

In the six years since the Elwell-GM settlement, Elwell has testified against GM both in Georgia (pursuant to the exception contained in the injunction) and in several other jurisdictions in which Elwell has been subpoenaed to testify.

B

*The Suit Between the Bakers and General Motors*

Having described the Elwell-GM employment termination litigation, we next summarize the wrongful-death complaint underlying this case. The decedent, Beverly Garner, was a front-seat passenger in a 1985 Chevrolet S–10 Blazer involved in a February 1990 Missouri highway accident. The Blazer's engine caught fire, and both driver and passenger died. In September 1991, Garner's sons, Kenneth and Steven Baker, commenced a wrongful-death product liability action against GM in a Missouri state court. The Bakers alleged that a faulty fuel pump in the 1985 Blazer caused the engine fire that killed their mother. GM removed the case to federal court on the basis of the parties' diverse citizenship. On the merits, GM asserted that the fuel pump was neither faulty nor the cause of the fire, and that collision impact injuries alone caused Garner's death.

The Bakers sought both to depose Elwell and to call him as a witness at trial. GM objected to Elwell's appearance as a deponent or trial witness on the ground that the Michigan

injunction barred his testimony. In response, the Bakers urged that the Michigan injunction did not override a Missouri subpoena for Elwell's testimony. The Bakers further noted that, under the Elwell-GM settlement agreement, Elwell could testify if a court so ordered, and such testimony would not be actionable as a violation of the Michigan injunction.

After *in camera* review of the Michigan injunction and the settlement agreement, the Federal District Court in Missouri allowed the Bakers to depose Elwell and to call him as a witness at trial. Responding to GM's objection, the District Court stated alternative grounds for its ruling: (1) Michigan's injunction need not be enforced because blocking Elwell's testimony would violate Missouri's "public policy," which shielded from disclosure only privileged or otherwise confidential information; (2) just as the injunction could be modified in Michigan, so a court elsewhere could modify the decree.

At trial, Elwell testified in support of the Bakers' claim that the alleged defect in the fuel pump system contributed to the postcollision fire. In addition, he identified and described a 1973 internal GM memorandum bearing on the risk of fuel-fed engine fires. Following trial, the jury awarded the Bakers $11.3 million in damages, and the District Court entered judgment on the jury's verdict.

The United States Court of Appeals for the Eighth Circuit reversed the District Court's judgment, ruling, *inter alia,* that Elwell's testimony should not have been admitted. 86 F. 3d 811 (1996). Assuming, *arguendo,* the existence of a public policy exception to the full faith and credit command, the Court of Appeals concluded that the District Court erroneously relied on Missouri's policy favoring disclosure of relevant, nonprivileged information, see *id.,* at 818–819, for Missouri has an "equally strong public policy in favor of full faith and credit," *id.,* at 819.

The Eighth Circuit also determined that the evidence was insufficient to show that the Michigan court would modify

the injunction barring Elwell's testimony. See *id.*, at 819–820. The Court of Appeals observed that the Michigan court "has been asked on several occasions to modify the injunction, [but] has yet to do so," and noted that, if the Michigan court did not intend to block Elwell's testimony in cases like the Bakers', "the injunction would . . . have been unnecessary." *Id.*, at 820.

We granted certiorari to decide whether the full faith and credit requirement stops the Bakers, who were not parties to the Michigan proceeding, from obtaining Elwell's testimony in their Missouri wrongful-death action. 520 U. S. 1142 (1997).[2]

## II

### A

The Constitution's Full Faith and Credit Clause provides:

> "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." Art. IV, § 1.[3]

Pursuant to that Clause, Congress has prescribed:

> "Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or

---

[2] In conflict with the Eighth Circuit, many other lower courts have permitted Elwell to testify as to nonprivileged and non-trade-secret matters. See Addendum to Brief for Petitioners (citing cases).

[3] Predating the Constitution, the Articles of Confederation contained a provision of the same order: "Full faith and credit shall be given in each of these States to the records, acts and judicial proceedings of the courts and magistrates of every other State." Articles of Confederation, Art. IV. For a concise history of full faith and credit, see Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Colum. L. Rev. 1 (1945).

usage in the courts of such State, Territory or Possession from which they are taken." 28 U. S. C. § 1738.[4]

The animating purpose of the full faith and credit command, as this Court explained in *Milwaukee County* v. *M. E. White Co.*, 296 U. S. 268 (1935),

> "was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Id.*, at 277.

See also *Estin* v. *Estin*, 334 U. S. 541, 546 (1948) (the Full Faith and Credit Clause "substituted a command for the earlier principles of comity and thus basically altered the status of the States as independent sovereigns").

Our precedent differentiates the credit owed to laws (legislative measures and common law) and to judgments. "In numerous cases this Court has held that credit must be given to the judgment of another state although the forum would not be required to entertain the suit on which the judgment was founded." *Milwaukee County*, 296 U. S., at 277. The Full Faith and Credit Clause does not compel "a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n*, 306 U. S. 493, 501 (1939); see *Phillips*

---

[4] The first Congress enacted the original full faith and credit statute in May 1790. See Act of May 26, 1790, ch. 11, 1 Stat. 122 (codified as amended at 28 U. S. C. § 1738) ("And the said records and judicial proceedings authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the state from whence the said records are or shall be taken."). Although the text of the statute has been revised since then, the command for full faith and credit to judgments has remained constant.

*Petroleum Co.* v. *Shutts,* 472 U. S. 797, 818–819 (1985). Regarding judgments, however, the full faith and credit obligation is exacting. A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes,[5] in other words, the judgment of the rendering State gains nationwide force. See, *e. g., Matsushita Elec. Industrial Co.* v. *Epstein,* 516 U. S. 367, 373 (1996); *Kremer* v. *Chemical Constr. Corp.,* 456 U. S. 461, 485 (1982); see also Reese & Johnson, The Scope of Full Faith and Credit to Judgments, 49 Colum. L. Rev. 153 (1949).

A court may be guided by the forum State's "public policy" in determining the *law* applicable to a controversy. See *Nevada* v. *Hall,* 440 U. S. 410, 421–424 (1979).[6] But our decisions support no roving "public policy exception" to the full faith and credit due *judgments.* See *Estin,* 334 U. S., at 546 (Full Faith and Credit Clause "ordered submission . . . even to hostile policies reflected in the judgment of another State, because the practical operation of the federal system, which the Constitution designed, demanded it."); *Fauntleroy* v. *Lum,* 210 U. S. 230, 237 (1908) (judgment of Missouri court

---

[5] "Res judicata" is the term traditionally used to describe two discrete effects: (1) what we now call claim preclusion (a valid final adjudication of a claim precludes a second action on that claim or any part of it), see Restatement (Second) of Judgments §§ 17–19 (1982); and (2) issue preclusion, long called "collateral estoppel" (an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim), see *id.,* § 27. On use of the plain English terms claim and issue preclusion in lieu of res judicata and collateral estoppel, see *Migra* v. *Warren City School Dist. Bd. of Ed.,* 465 U. S. 75, 77, n. 1 (1984).

[6] See also Paulsen & Sovern, "Public Policy" in the Conflict of Laws, 56 Colum. L. Rev. 969, 980–981 (1956) (noting traditional but dubious use of the term "public policy" to obscure "an assertion of the forum's right to have its [own] law applied to the [controversy] because of the forum's relationship to it").

entitled to full faith and credit in Mississippi even if Missouri judgment rested on a misapprehension of Mississippi law). In assuming the existence of a ubiquitous "public policy exception" permitting one State to resist recognition of another State's judgment, the District Court in the Bakers' wrongful-death action, see *supra*, at 230, misread our precedent. "The full faith and credit clause is one of the provisions incorporated into the Constitution by its framers for the purpose of transforming an aggregation of independent, sovereign States into a nation." *Sherrer* v. *Sherrer*, 334 U. S. 343, 355 (1948). We are "aware of [no] considerations of local policy or law which could rightly be deemed to impair the force and effect which the full faith and credit clause and the Act of Congress require to be given to [a money] judgment outside the state of its rendition." *Magnolia Petroleum Co.* v. *Hunt*, 320 U. S. 430, 438 (1943).

The Court has never placed equity decrees outside the full faith and credit domain. Equity decrees for the payment of money have long been considered equivalent to judgments at law entitled to nationwide recognition. See, *e. g., Barber* v. *Barber*, 323 U. S. 77 (1944) (unconditional adjudication of petitioner's right to recover a sum of money is entitled to full faith and credit); see also A. Ehrenzweig, Conflict of Laws § 51, p. 182 (rev. ed. 1962) (describing as "indefensible" the old doctrine that an equity decree, because it does not "merge" the claim into the judgment, does not qualify for recognition). We see no reason why the preclusive effects of an adjudication on parties and those "in privity" with them, *i. e.*, claim preclusion and issue preclusion (res judicata and collateral estoppel),[7] should differ depending solely upon the type of relief sought in a civil action. Cf. *Barber*, 323

---

[7] See *supra*, at 233, n. 5; 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4467, p. 635 (1981) (Although "[a] second state need not directly enforce an injunction entered by another state . . . [it] may often be required to honor the issue preclusion effects of the first judgment.").

U. S., at 87 (Jackson, J., concurring) (Full Faith and Credit Clause and its implementing statute speak not of "judgments" but of "'judicial proceedings' without limitation"); Fed. Rule Civ. Proc. 2 (providing for "one form of action to be known as 'civil action,'" in lieu of discretely labeled actions at law and suits in equity).

Full faith and credit, however, does not mean that States must adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments. Enforcement measures do not travel with the sister state judgment as preclusive effects do; such measures remain subject to the evenhanded control of forum law. See *McElmoyle ex rel. Bailey* v. *Cohen*, 13 Pet. 312, 325 (1839) (judgment may be enforced only as "laws [of enforcing forum] may permit"); see also Restatement (Second) of Conflict of Laws § 99 (1969) ("The local law of the forum determines the methods by which a judgment of another state is enforced.").[8]

Orders commanding action or inaction have been denied enforcement in a sister State when they purported to accomplish an official act within the exclusive province of that other State or interfered with litigation over which the ordering State had no authority. Thus, a sister State's decree concerning land ownership in another State has been held ineffective *to transfer title*, see *Fall* v. *Eastin*, 215 U. S. 1 (1909), although such a decree may indeed preclusively adjudicate the rights and obligations running between the *parties* to the foreign litigation, see, *e. g.*, *Robertson* v. *Howard*, 229 U. S. 254, 261 (1913) ("[I]t may not be doubted that a

---

[8] Congress has provided for the interdistrict registration of federal-court judgments for the recovery of money or property. 28 U. S. C. § 1963 (upon registration, the judgment "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner"). A similar interstate registration procedure is effective in most States, as a result of widespread adoption of the Revised Uniform Enforcement of Foreign Judgments Act, 13 U. L. A. 149 (1986). See *id.*, at 13 (Supp. 1997) (Table) (listing adoptions in 44 States and the District of Columbia).

court of equity in one State in a proper case could compel a defendant before it to convey property situated in another State."). And antisuit injunctions regarding litigation elsewhere, even if compatible with due process as a direction constraining parties to the decree, see *Cole* v. *Cunningham,* 133 U. S. 107 (1890), in fact have not controlled the second court's actions regarding litigation in that court. See, *e. g., James* v. *Grand Trunk Western R. Co.,* 14 Ill. 2d 356, 372, 152 N. E. 2d 858, 867 (1958); see also E. Scoles & P. Hay, Conflict of Laws § 24.21, p. 981 (2d ed. 1992) (observing that antisuit injunction "does not address, and thus has no preclusive effect on, the merits of the litigation [in the second forum]").[9] Sanctions for violations of an injunction, in any event, are generally administered by the court that issued the injunction. See, *e. g., Stiller* v. *Hardman,* 324 F. 2d 626, 628 (CA2 1963) (nonrendition forum enforces monetary relief portion of a judgment but leaves enforcement of injunctive portion to rendition forum).

---

[9] This Court has held it impermissible for a state court to enjoin a party from proceeding in a federal court, see *Donovan* v. *Dallas,* 377 U. S. 408 (1964), but has not yet ruled on the credit due to a state-court injunction barring a party from maintaining litigation in another State, see Ginsburg, Judgments in Search of Full Faith and Credit: The Last-in-Time Rule for Conflicting Judgments, 82 Harv. L. Rev. 798, 823 (1969); see also Reese, Full Faith and Credit to Foreign Equity Decrees, 42 Iowa L. Rev. 183, 198 (1957) (urging that, although this Court "has not yet had occasion to determine [the issue], . . . . full faith and credit does not require dismissal of an action whose prosecution has been enjoined," for to hold otherwise "would mean in effect that the courts of one state can control what goes on in the courts of another"). State courts that have dealt with the question have, in the main, regarded antisuit injunctions as outside the full faith and credit ambit. See Ginsburg, 82 Harv. L. Rev., at 823, and n. 99; see also *id.,* at 828–829 ("The current state of the law, permitting [an antisuit] injunction to issue but not compelling any deference outside the rendering state, may be the most reasonable compromise between . . . extreme alternatives," *i. e.,* "[a] general rule of respect for antisuit injunctions running between state courts," or "a general rule denying the states authority to issue injunctions directed at proceedings in other states").

## B

With these background principles in view, we turn to the dimensions of the order GM relies upon to stop Elwell's testimony. Specifically, we take up the question: What matters did the Michigan injunction legitimately conclude?

As earlier recounted, see *supra*, at 228–229, the parties before the Michigan County Court, Elwell and GM, submitted an agreed-upon injunction, which the presiding judge signed.[10]   While no issue was joined, expressly litigated, and determined in the Michigan proceeding,[11] that order is *claim* preclusive between Elwell and GM.   Elwell's claim for

---

[10] GM emphasizes that a key factor warranting the injunction was Elwell's inability to assure that any testimony he might give would steer clear of knowledge he gained from protected confidential communications. See Brief for Respondent 28–29; see also *id.*, at 32 (contending that Elwell's testimony "is pervasively and uncontrollably leavened with General Motors' privileged information"). Petitioners assert, and GM does not dispute, however, that at no point during Elwell's testimony in the Bakers' wrongful-death action did GM object to any question or answer on the grounds of attorney-client, attorney-work product, or trade secrets privilege. See Brief for Petitioners 9.

[11] In no event, we have observed, can issue preclusion be invoked against one who did not participate in the prior adjudication. See *Blonder-Tongue Laboratories, Inc.* v. *University of Ill. Foundation*, 402 U. S. 313, 329 (1971); *Hansberry* v. *Lee*, 311 U. S. 32, 40 (1940). Thus, JUSTICE KENNEDY emphasizes the obvious in noting that the Michigan judgment has no preclusive effect on the Bakers, for they were not parties to the Michigan litigation. See *post*, at 246–248. Such an observation misses the thrust of GM's argument. GM readily acknowledges "the commonplace rule that a person may not be bound by a judgment *in personam* in a case to which he was not made a party." Brief for Respondent 35. But, GM adds, the Michigan decree does not bind the Bakers; it binds *Elwell* only. Most forcibly, GM insists that the Bakers cannot object to the binding effect GM seeks for the Michigan judgment because the Bakers have no constitutionally protected interest in obtaining the testimony of a particular witness. See *id.*, at 39 ("[T]he only party being 'bound' to the injunction is Elwell, and holding him to his legal obligations does not violate anyone's due process rights."). Given this argument, it is clear that issue preclusion principles, standing alone, cannot resolve the controversy GM presents.

wrongful discharge and his related contract and tort claims have "merged in the judgment," and he cannot sue again to recover more. See *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 326, n. 5 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."); see also Restatement (Second) of Judgments § 17 (1980). Similarly, GM cannot sue Elwell elsewhere on the counterclaim GM asserted in Michigan. See *id.,* § 23, Comment *a,* p. 194 ("A defendant who interposes a counterclaim is, in substance, a plaintiff, as far as the counterclaim is concerned, and the plaintiff is, in substance, a defendant.").

Michigan's judgment, however, cannot reach beyond the Elwell-GM controversy to control proceedings against GM brought in other States, by other parties, asserting claims the merits of which Michigan has not considered. Michigan has no power over those parties, and no basis for commanding them to become intervenors in the Elwell-GM dispute. See *Martin* v. *Wilks*, 490 U. S. 755, 761–763 (1989). Most essentially, Michigan lacks authority to control courts elsewhere by precluding them, in actions brought by strangers to the Michigan litigation, from determining for themselves what witnesses are competent to testify and what evidence is relevant and admissible in their search for the truth. See Restatement (Second) of Conflict of Laws §§ 137–139 (1969 and rev. 1988) (forum's own law governs witness competence and grounds for excluding evidence); cf. *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 544, n. 29 (1987) (foreign "blocking statute" barring disclosure of certain information "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce [the information]"); *United States* v. *First Nat. City Bank*, 396 F. 2d 897 (CA2 1968) (New York bank may not refuse to produce records of its German branch, even though doing so might subject the bank to civil liability under German law).

As the District Court recognized, Michigan's decree could operate against Elwell to preclude him from *volunteering* his testimony. See App. to Pet. for Cert. 26a–27a. But a Michigan court cannot, by entering the injunction to which Elwell and GM stipulated, dictate to a court in another jurisdiction that evidence relevant in the Bakers' case—a controversy to which Michigan is foreign—shall be inadmissible. This conclusion creates no general exception to the full faith and credit command, and surely does not permit a State to refuse to honor a sister state judgment based on the forum's choice of law or policy preferences. Rather, we simply recognize that, just as the mechanisms for enforcing a judgment do not travel with the judgment itself for purposes of full faith and credit, see *McElmoyle ex rel. Bailey* v. *Cohen,* 13 Pet. 312 (1839); see also Restatement (Second) of Conflict of Laws § 99, and just as one State's judgment cannot automatically transfer title to land in another State, see *Fall* v. *Eastin,* 215 U. S. 1 (1909), similarly the Michigan decree cannot determine evidentiary issues in a lawsuit brought by parties who were not subject to the jurisdiction of the Michigan court. Cf. *United States* v. *Nixon,* 418 U. S. 683, 710 (1974) ("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.").[12]

---

[12] JUSTICE KENNEDY inexplicably reads into our decision a sweeping exception to full faith and credit based solely on "the integrity of Missouri's judicial processes." *Post,* at 246. The Michigan judgment is not entitled to full faith and credit, we have endeavored to make plain, because it impermissibly interferes with Missouri's control of litigation *brought by parties who were not before the Michigan court.* Thus, JUSTICE KENNEDY's hypothetical, see *post,* at 245–246, misses the mark. If the Bakers had been parties to the Michigan proceedings and had actually litigated the privileged character of Elwell's testimony, the Bakers would of course be precluded from relitigating that issue in Missouri. See *Cromwell* v. *County of Sac,* 94 U. S. 351, 354 (1877) ("[D]etermination of a question directly involved in one action is conclusive as to that question in a second suit between the same parties . . . ."); see also *supra,* at 233, n. 5.

The language of the consent decree is informative in this regard. Excluding the then-pending Georgia action from the ban on testimony by Elwell without GM's permission, the decree provides that it "shall not operate to *interfere with the jurisdiction* of the Court in . . . Georgia." *Elwell* v. *General Motors Corp.*, No. 91–115946NZ (Wayne Cty.) (Order Dismissing Plaintiff's Complaint and Granting Permanent Injunction, p. 2), App. 30 (emphasis added). But if the Michigan order, extended to the Georgia case, would have "interfer[ed] with the jurisdiction" of the Georgia court, Michigan's ban would, in the same way, "interfere with the jurisdiction" of courts in other States in cases similar to the one pending in Georgia.

In line with its recognition of the interference potential of the consent decree, GM provided in the settlement agreement that, if another court ordered Elwell to testify, his testimony would "in no way" render him vulnerable to suit in Michigan for violation of the injunction or agreement. See 86 F. 3d, at 815, 820, n. 11. The Eighth Circuit regarded this settlement agreement provision as merely a concession by GM that "some courts might fail to extend full faith and credit to the [Michigan] injunction." *Ibid.* As we have explained, however, Michigan's power does not reach into a Missouri courtroom to displace the forum's own determination whether to admit or exclude evidence relevant in the Bakers' wrongful-death case before it. In that light, we see no altruism in GM's agreement not to institute contempt or breach-of-contract proceedings against Elwell in Michigan for giving subpoenaed testimony elsewhere. Rather, we find it telling that GM ruled out resort to the court that entered the injunction, for injunctions are ordinarily enforced by the enjoining court, not by a surrogate tribunal. See *supra*, at 236.

In sum, Michigan has no authority to shield a witness from another jurisdiction's subpoena power in a case involving persons and causes outside Michigan's governance. Recog-

nition, under full faith and credit, is owed to dispositions Michigan has authority to order. But a Michigan decree cannot command obedience elsewhere on a matter the Michigan court lacks authority to resolve. See *Thomas* v. *Washington Gas Light Co.*, 448 U. S. 261, 282–283 (1980) (plurality opinion) ("Full faith and credit must be given to [a] determination that [a State's tribunal] had the authority to make; but by a parity of reasoning, full faith and credit need not be given to determinations that it had no power to make.").

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court that enforcement measures do not travel with sister-state judgments as preclusive effects do. *Ante*, at 235. It has long been established that "the judgment of a state Court cannot be enforced out of the state by an execution issued within it." *McElmoyle ex rel. Bailey* v. *Cohen*, 13 Pet. 312, 325 (1839). To recite that principle is to decide this case.

General Motors asked a District Court in Missouri to *enforce* a Michigan injunction. The Missouri court was no more obliged to enforce the Michigan injunction by preventing Elwell from presenting his testimony than it was obliged to enforce it by holding Elwell in contempt. The Full Faith and Credit Clause " 'did not make the judgments of other States domestic judgments to all intents and purposes, but only gave a general validity, faith, and credit to them, *as evidence*. No execution can issue upon such judgments without a new suit in the tribunals of other States.' " *Thompson* v. *Whitman*, 18 Wall. 457, 462–463 (1874) (empha-

sis added) (quoting J. Story, Conflict of Laws § 609 (7th ed. 1872)). A judgment or decree of one State, to be sure, may be grounds for an action (or a defense to one) in another. But the Clause and its implementing statute

> "establish a rule of evidence, rather than of jurisdiction. While they make the record of a judgment, rendered after due notice in one State, conclusive evidence in the courts of another State, or of the United States, of the matter adjudged, they do not affect the jurisdiction, either of the court in which the judgment is rendered, or of the court in which it is offered in evidence. Judgments recovered in one State of the Union, when proved in the courts of another government, whether state or national, within the United States, differ from judgments recovered in a foreign country in no other respect than in not being reexaminable on their merits, nor impeachable for fraud in obtaining them, if rendered by a court having jurisdiction of the cause and of the parties." *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 291–292 (1888) (citation omitted).

The judgment that General Motors obtained in Michigan "'does not carry with it, into another State, the efficacy of a judgment upon property or persons, to be enforced by execution. To give it the force of a judgment in another State, it must be made a judgment there; and can only be executed in the latter as its laws may permit.'" *Lynde* v. *Lynde*, 181 U. S. 183, 187 (1901) (quoting *McElmoyle, supra,* at 325). See, *e. g., Watts* v. *Waddle*, 6 Pet. 389, 392 (1832), a case involving a suit to obtain an equity decree ordering the conveyance of land, duplicating such a decree already issued in another State.

Because neither the Full Faith and Credit Clause nor its implementing statute requires Missouri to execute the injunction issued by the courts of Michigan, I concur in the judgment.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, concurring in the judgment.

I concur in the judgment. In my view the case is controlled by well-settled full faith and credit principles which render the majority's extended analysis unnecessary and, with all due respect, problematic in some degree. This separate opinion explains my approach.

## I

The majority, of course, is correct to hold that when a judgment is presented to the courts of a second State it may not be denied enforcement based upon some disagreement with the laws of the State of rendition. Full faith and credit forbids the second State to question a judgment on these grounds. There can be little doubt of this proposition. We have often recognized the second State's obligation to give effect to another State's judgments even when the law underlying those judgments contravenes the public policy of the second State. See, e. g., *Estin* v. *Estin*, 334 U. S. 541, 544–546 (1948); *Sherrer* v. *Sherrer*, 334 U. S. 343, 354–355 (1948); *Magnolia Petroleum Co.* v. *Hunt*, 320 U. S. 430, 438 (1943); *Williams* v. *North Carolina*, 317 U. S. 287, 294–295 (1942); *Fauntleroy* v. *Lum*, 210 U. S. 230, 237 (1908).

My concern is that the majority, having stated the principle, proceeds to disregard it by announcing two broad exceptions. First, the majority would allow courts outside the issuing State to decline to enforce those judgments "purport[ing] to accomplish an official act within the exclusive province of [a sister] State." *Ante*, at 235. Second, the basic rule of full faith and credit is said not to cover injunctions "interfer[ing] with litigation over which the ordering State had no authority." *Ibid*. The exceptions the majority recognizes are neither consistent with its rejection of a public policy exception to full faith and credit nor in accord with established rules implementing the Full Faith and Credit Clause. As employed to resolve this case, furthermore, the

exceptions to full faith and credit have a potential for disrupting judgments, and this ought to give us considerable pause.

Our decisions have been careful not to foreclose all effect for the types of injunctions the majority would place outside the ambit of full faith and credit. These authorities seem to be disregarded by today's holding. For example, the majority chooses to discuss the extent to which courts may compel the conveyance of property in other jurisdictions. That subject has proved to be quite difficult. Some of our cases uphold actions by state courts affecting land outside their territorial reach. *E. g.*, *Robertson* v. *Howard*, 229 U. S. 254, 261 (1913) ("[I]t may not be doubted that a court of equity in one State in a proper case could compel a defendant before it to convey property situated in another State"); see also *Carpenter* v. *Strange*, 141 U. S. 87, 105–106 (1891); *Muller* v. *Dows*, 94 U. S. 444, 449 (1877); *Massie* v. *Watts*, 6 Cranch 148 (1810). See generally 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2945, pp. 98–102 (2d ed. 1995); Restatement (Second) of Conflict of Laws § 102, Comment *d* (1969); Reese, Full Faith and Credit to Foreign Equity Decrees, 42 Iowa L. Rev. 183, 199–200 (1957). Nor have we undertaken before today to announce an exception which denies full faith and credit based on the principle that the prior judgment interferes with litigation pending in another jurisdiction. See, *e. g.*, *Cole* v. *Cunningham*, 133 U. S. 107, 116–117 (1890); *Simon* v. *Southern R. Co.*, 236 U. S. 115, 122 (1915); cf. *Baltimore & Ohio R. Co.* v. *Kepner*, 314 U. S. 44, 51–52 (1941); *Donovan* v. *Dallas*, 377 U. S. 408, 415–418 (1964) (Harlan, J., dissenting). See generally Reese, *supra*, at 198 ("[T]he Supreme Court has not yet had occasion to determine whether [the practice of ignoring antisuit injunctions] is consistent with full faith and credit"). As a general matter, there is disagreement among the state courts as to their duty to recognize decrees enjoining proceedings in other courts. See Schopler, Extraterritorial recognition of, and propriety of counterinjunction against, injunction

against actions in courts of other states, 74 A. L. R. 2d 831–834, §§ 3–4 (1960 and Supp. 1986).

Subjects which are at once so fundamental and so delicate as these ought to be addressed only in a case necessarily requiring their discussion, and even then with caution lest we announce rules which will not be sound in later application. See Restatement, *supra*, § 102, Comment *c* ("The Supreme Court of the United States has not had occasion to determine whether full faith and credit requires a State of the United States to enforce a valid judgment of a sister State that orders the doing of an act other than the payment of money or that enjoins the doing of an act"); E. Scoles & P. Hay, Conflict of Laws § 24.9, p. 964 (2d ed. 1992) (noting that interstate recognition of equity decrees other than divorce decrees and decrees ordering payment of money "has been a matter of some uncertainty"). We might be required to hold, if some future case raises the issue, that an otherwise valid judgment cannot intrude upon essential processes of courts outside the issuing State in certain narrow circumstances, but we need not announce or define that principle here. Even if some qualification of full faith and credit were required where the judicial processes of a second State are sought to be controlled in their procedural and institutional aspects, the Court's discussion does not provide sufficient guidance on how this exception should be construed in light of our precedents. The majority's broad review of these matters does not articulate the rationale underlying its conclusions. In the absence of more elaboration, it is unclear what it is about the particular injunction here that renders it undeserving of full faith and credit. The Court's reliance upon unidentified principles to justify omitting certain types of injunctions from the doctrine's application leaves its decision in uneasy tension with its own rejection of a broad public policy exception to full faith and credit.

The following example illustrates the uncertainty surrounding the majority's approach. Suppose the Bakers had anticipated the need for Elwell's testimony in Missouri and

had appeared in a Michigan court to litigate the privileged character of the testimony it sought to elicit. Assume further the law on privilege were the same in both jurisdictions. If Elwell, General Motors (GM), and the Bakers were before the Michigan court and Michigan law gave its own injunction preclusive effect, the Bakers could not relitigate the point, if general principles of issue preclusion control. Perhaps the argument can be made, as the majority appears to say, that the integrity of Missouri's judicial processes demands a rule allowing relitigation of the issue; but, for the reasons given below, we need not confront this interesting question.

In any event, the rule would be an exception. Full faith and credit requires courts to do more than provide for direct enforcement of the judgments issued by other States. It also "requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461, 466 (1982); accord, *Parsons Steel, Inc.* v. *First Alabama Bank*, 474 U. S. 518, 525 (1986); *Marrese* v. *American Academy of Orthopaedic Surgeons*, 470 U. S. 373, 380–381, 384 (1985); *Migra* v. *Warren City School Dist. Bd. of Ed.*, 465 U. S. 75, 81 (1984); *Haring* v. *Prosise*, 462 U. S. 306, 313 (1983); *Allen* v. *McCurry*, 449 U. S. 90, 96 (1980). Through full faith and credit, "the local doctrines of *res judicata*, speaking generally, become a part of national jurisprudence . . . ." *Riley* v. *New York Trust Co.*, 315 U. S. 343, 349 (1942). And whether or not an injunction is enforceable in another State on its own terms, the courts of a second State are required to honor its issue preclusive effects. See *Parsons Steel, supra;* 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4467, p. 635 (1981).

## II

In the case before us, of course, the Bakers were neither parties to the earlier litigation nor subject to the jurisdiction

of the Michigan courts. The majority pays scant attention to this circumstance, which becomes critical. The beginning point of full faith and credit analysis requires a determination of the effect the judgment has in the courts of the issuing State. In our most recent full faith and credit cases, we have said that determining the force and effect of a judgment should be the first step in our analysis. *Matsushita Elec. Industrial Co.* v. *Epstein,* 516 U. S. 367, 375 (1996); *Marrese, supra,* at 381–382; *Haring, supra,* at 314; see also *Kremer, supra,* at 466–467. "If the state courts would not give preclusive effect to the prior judgment, 'the courts of the United States can accord it no greater efficacy' under § 1738." *Haring, supra,* at 313, n. 6 (quoting *Union & Planters' Bank* v. *Memphis,* 189 U. S. 71, 75 (1903)); accord, *Marrese,* 470 U. S., at 384. A conclusion that the issuing State would not give the prior judgment preclusive effect ends the inquiry, making it unnecessary to determine the existence of any exceptions to full faith and credit. *Id.,* at 383, 386. We cannot decline to inquire into these state-law questions when the inquiry will obviate new extensions or exceptions to full faith and credit. See *Haring, supra,* at 314, n. 8.

If we honor the undoubted principle that courts need give a prior judgment no more force or effect that the issuing State gives it, the case before us is resolved. Here the Court of Appeals and both parties in their arguments before our Court seemed to embrace the assumption that Michigan would apply the full force of its judgment to the Bakers. Michigan law does not appear to support the assumption.

The simple fact is that the Bakers were not parties to the Michigan proceedings, and nothing indicates Michigan would make the novel assertion that its earlier injunction binds the Bakers or any other party not then before it or subject to its jurisdiction. For collateral estoppel to apply under Michigan law, "'the same parties must have had a full opportunity to litigate the issue, and there must be mutuality of estoppel.'" *Nummer* v. *Treasury Dept.,* 448 Mich. 534, 542, 533

N. W. 2d 250, 253 (quoting *Storey* v. *Meijer, Inc.*, 431 Mich. 368, 373, n. 3, 429 N. W. 2d 169, 171, n. 3 (1988)), cert. denied, 516 U. S. 964 (1995). "Although there is a trend in modern law to abolish the requirement of mutuality, this Court reaffirmed its commitment to that doctrine in 1971 in [*Howell* v. *Vito's Trucking & Excavating Co.*, 386 Mich. 37, 191 N. W. 2d 313]. Mutuality of estoppel remains the law in this jurisdiction . . . ." *Lichon* v. *American Universal Ins. Co.*, 435 Mich. 408, 427–428, 459 N. W. 2d 288, 298 (1990) (footnote omitted). Since the Bakers were not parties to the Michigan proceedings and had no opportunity to litigate any of the issues presented, it appears that Michigan law would not treat them as bound by the judgment. The majority cites no authority to the contrary.

It makes no difference that the judgment in question is an injunction. The Michigan Supreme Court has twice rejected arguments that injunctions have preclusive effect in later litigation, relying in no small part on the fact that the persons against whom preclusion is asserted were not parties to the earlier litigation. *Bacon* v. *Walden*, 186 Mich. 139, 144, 152 N. W. 1061, 1063 (1915) ("Defendant was not a party to [the prior injunctive] suit and was not as a matter of law affected or bound by the decree rendered in it"); *Detroit* v. *Detroit R. Co.*, 134 Mich. 11, 15, 95 N. W. 992, 993 (1903) ("[T]he fact that defendant was in no way a party to the record is sufficient answer to the contention that the holding of the circuit judge in that [prior injunctive] case is a controlling determination of the present").

The opinion of the Court of Appeals suggests the Michigan court which issued the injunction intended to bind third parties in litigation in other States. 86 F. 3d 811, 820 (CA8 1996). The question, however, is not what a trial court intended in a particular case but the preclusive effect its judgment has under the controlling legal principles of its own State. Full faith and credit measures the effect of a judgment by all the laws of the rendering State, including author-

itative rulings of that State's highest court on questions of issue preclusion and jurisdiction over third parties. See *Kremer*, 456 U. S., at 466; *Matsushita, supra,* at 375.

The fact that other Michigan trial courts refused to reconsider the injunction but instead required litigants to return to the trial court which issued it in the first place sheds little light on the substance of issue preclusion law in Michigan. In construing state law, we must determine how the highest court of the State would decide an issue. See *King* v. *Order of United Commercial Travelers of America,* 333 U. S. 153, 160–161 (1948); *Commissioner* v. *Estate of Bosch,* 387 U. S. 456, 464–465 (1967).

In this case, moreover, those Michigan trial courts which declined to modify the injunction did not appear to base their rulings on preclusion law. They relied instead on Michigan Court Rule 2.613(B), which directs parties wishing to modify an injunction to present their arguments to the court which entered it. See Brief for Respondent 10. Rule 2.613(B) is a procedural rule based on comity concerns, not a preclusion rule. It reflects Michigan's determination that, within the State of Michigan itself, respect for the issuing court and judicial resources are best preserved by allowing the issuing court to determine whether the injunction should apply to further proceedings. As a procedural rule, it is not binding on courts of another State by virtue of full faith and credit. See *Sun Oil Co.* v. *Wortman,* 486 U. S. 717, 722 (1988) ("[A] State may apply its own procedural rules to actions litigated in its courts"). The Bakers have never appeared in a Michigan court, and full faith and credit cannot be used to force them to subject themselves to Michigan's jurisdiction. See *Baker* v. *Baker, Eccles & Co.,* 242 U. S. 394, 403 (1917) ("And to assume that a party resident beyond the confines of a State is required to come within its borders and submit his personal controversy to its tribunals upon receiving notice of the suit at the place of his residence is a futile attempt

to extend the authority and control of a State beyond its own territory").

Under Michigan law, the burden of persuasion rests on the party raising preclusion as a defense. See *Detroit* v. *Qualls*, 434 Mich. 340, 357–358, 454 N. W. 2d 374, 383 (1990); *E & G Finance Co.* v. *Simms*, 362 Mich. 592, 596, 107 N. W. 2d 911, 914 (1961). In light of these doctrines and the absence of contrary authority, one cannot conclude that GM has carried its burden of showing that Michigan courts would bind the Bakers to the terms of the earlier injunction prohibiting Elwell from testifying. The result should come as no surprise. It is most unlikely that Michigan would give a judgment preclusive effect against a person who was not a party to the proceeding in which it was entered or who was not otherwise subject to the jurisdiction of the issuing court. See *Kremer, supra*, at 480–481 ("We have previously recognized that the judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue").

Although inconsistent on this point, GM disavows its desire to issue preclude the Bakers, claiming "the only party being 'bound' to the injunction is Elwell." Brief for Respondent 39. This is difficult to accept because in assessing the preclusive reach of a judgment we look to its practical effect. *E. g., Martin* v. *Wilks*, 490 U. S. 755, 765, n. 6 (1989); cf., *e. g., Donovan* v. *Dallas*, 377 U. S., at 413 ("[I]t does not matter that the prohibition here was addressed to the parties rather than to the federal court itself"); *Oklahoma Packing Co.* v. *Oklahoma Gas & Elec. Co.*, 309 U. S. 4, 9 (1940) ("That the injunction was a restraint of the parties and was not formally directed against the state court itself is immaterial"). Despite its disclaimer, GM seeks to alter the course of the suit between it and the Bakers by preventing the Bakers from litigating the admissibility of Elwell's testimony. Furthermore, even were we to accept GM's argument that

the Bakers are essentially irrelevant to this dispute, GM's argument is flawed on its own terms. Elwell, in the present litigation, does not seek to relitigate anything; he is a witness, not a party.

In all events, determining as a threshold matter the extent to which Michigan law gives preclusive effect to the injunction eliminates the need to decide whether full faith and credit applies to equitable decrees as a general matter or the extent to which the general rules of full faith and credit are subject to exceptions. Michigan law would not seek to bind the Bakers to the injunction and that suffices to resolve the case. For these reasons, I concur in the judgment.