**State of TENNESSEE ex rel. Douglas SIZEMORE, Plaintiffs,**

**v.**

**SURETY BANK, N.A., formerly Texas Bank, N.A., Defendant.**

**No. 3:95–CV–0870–D.**

United States District Court,
N.D. Texas,
Dallas Division.

July 29, 1998.

Larry Hallman, Burford & Ryburn, Dallas, TX, William W. Gibson, Nashville, TN, Andrew B. Campbell, Wyatt Tarrant & Combs, Nashville, TN, for plaintiffs.

Sterling Wallace Steves, Lane Ray Wilson Carr & Steves, Fort Worth, TX, Kleber Claude Miller, Christopher Guy Lyster, Shannon Gracey Ratliff & Miller, Fort Worth, TX, for defendant.

## MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

URBOM, Senior District Judge.

## I. FACTUAL BACKGROUND

The following section sets forth the undisputed facts that are relevant to the resolution of the pending motions. The plaintiff, Douglas Sizemore [hereinafter "the Receiver"], is the duly appointed Conservator and Liquidator[1] of all assets of Anchorage Fire & Casualty Insurance Company, also known as Global Capital Assurance Company, Ltd. The defendant, Surety Bank, N.A. [hereinafter "the Bank" or "Surety"], formerly known as Texas Bank, N.A., is a financial institution located in Hurst, Texas.

The Bank is in the business of insurance premium financing. In other words, the Bank lends money to individual purchasers of insurance coverage, thus enabling the insureds to finance the insurance premium for their coverage. In the particular agreements relevant to this case, the Bank required an insured to execute an "Insurance Premium Finance note" [hereinafter "IPF note"] that contained the terms of the loan, the interest rate, and included a promissory note. Surety extended such financing to insureds of Anchorage. Some of these IPF notes were "participated" or bought from Surety by Anchorage.

### A. Tennessee Proceedings

On March 1, 1993, the United States District Court for the Middle District of Tennessee (Nashville Division) entered a temporary restraining order in *United Physicians Insurance Risk Retention Group v. Anchorage Fire & Casualty Insurance Company*, 3–92–0263, in which the court enjoined several financial institutions from transferring, disbursing, or in any way interfering with monies held in accounts in the name of Anchorage. Among the accounts included in the injunction were three held by Surety: 1009216, 1008855, and 1007848. (TRO, Plaintiff's Motion for Summary Judgment, Exhibit C, at 2, 3, & 5 and Attachment). The Bank

---

1. The Tennessee Insurers Rehabilitation and Liquidation Act, the provisions of which form the basis for the plaintiff's suit, states that the term, "Receiver," encompasses a receiver, liquidator, rehabilitator, or conservator, as the context requires. TENN.CODE ANN. § 56–9–103(14). Therefore, for simplicity, I will refer to the plaintiff either as "the plaintiff" or as "the Receiver."

became aware of the Temporary Restraining Order in March 1993[2] by fax.

On March 9, 1993, the Chancery Court for the Twentieth Judicial District, Davidson County, Tennessee, entered a Conservation Order in *State of Tennessee, ex rel., Elaine A. McReynolds v. Anchorage Fire & Casualty Insurance Company*, 93–683–III, which placed Anchorage into receivership pursuant to the Tennessee Insurers Rehabilitation and Liquidation Act, Tennessee Code Annotated sections 56–9–101 *et seq.* Finding, *inter alia*, that Anchorage was "in such condition that further transaction of business would be hazardous financially to its policyholders, creditors and the public," the Conservation Order also contained the following temporary injunction:

> [A]ll persons firms, corporations and associations, including, but not limited to, Respondent Anchorage and its officers, directors, stockholders, members, subscribers, agents and all other persons are prohibited and enjoined from the transaction of further business [and] from the waste, transfer or disposition of its property; from the dissipation of and/or transfer of its bank accounts; from interference with the conservator or the Conservatorship; from the institution or further prosecution or any actions or proceedings; from the making of any sale or deed for nonpayment of taxes or assessments that would lessen the value of the assets of the insurer; from the withholding from the Conservator of books, accounts, documents, or the records relating to the business of the insurer; from any other threatened or contemplated action that might lessen the value of the insurer's assets or prejudice the rights of policy holders, creditors, shareholders or any proceed-

ing under the Conservatorship; or the obtaining of preferences, judgments, attachments or other liens, or the making of any levy against the insurer or against its assets or any part thereof until further order of this Court; and that this Court further authorizes the Conservator to apply outside of Tennessee for the relief above described.

(Conservation Order, Plaintiff's Motion for Summary Judgment, Exhibit D, at 4, 5–6). The order directed the Commissioner of Commerce and Insurance for the State of Tennessee (at the time, Elaine A. McReynolds) to take possession of the assets of Anchorage and administer them under the general supervision of the court. The Commissioner received "all the powers of the directors, officers and managers [of Anchorage], whose authority [was] suspended." (*Id.* at 7, ¶ F).

Two months later, on May 13, 1993, the Tennessee Chancery Court converted the Anchorage conservation proceedings to liquidation proceedings. The temporary injunction in the Conservation Order became a permanent injunction in the Order of Liquidation and Permanent Injunction ["Liquidation Order"].[3] The order instructed McReynolds to "liquidate the business of Anchorage" and authorized her in part to "take possession of all the property, assets and estate, and rights of action, and all other property whatsoever and wheresoever located, whether within or without the State of Tennessee belonging to Anchorage." (Liquidation Order, Plaintiff's Motion for Summary Judgment, Exhibit E, at 5–6, ¶¶ b and d).

The plaintiff's counsel domesticated the Conservation Order in Texas on March 16, 1993, and the Liquidation Order on June

---

**2.** On what day in March the Bank received the fax is unclear. The defendant answered interrogatories stating that it became aware of the TRO on March 4, 1993, by fax. (Plaintiff's Motion for Summary Judgment, Exhibit G, Answer to Interrogatory 11). However, at a hearing held on the motion for summary judgment on July 9, 1998, the plaintiff introduced copies of fax transmittals of the TRO that were transmitted on March 1, 1993. (Exhibits 1 and 2, introduced at July 9, 1998, summary judgment hearing).

**3.** Throughout this memorandum, I sometimes will refer to the Tennessee Conservation Order and Liquidation Order collectively as "the Tennessee orders."

21, 1993. (Exhibits 3–6, July 9, 1998, hearing on motions for summary judgment). The defendant received notice of the domesticated orders on March 16, 1993, and June 22, 1993, respectively. (Plaintiff's Motion for Summary Judgment, Exhibit F, Answers to Interrogatories Nos. 12 and 13).

## B. Texas Proceedings

Meanwhile, on April 19, 1993, the Bank filed a motion to intervene in a suit in Texas, *United Shortline Inc. Assurance Services, N.A. v. MacGregor General Insurance Company, Ltd.* In that case, United Shortline, Inc. Assurance Services, N.A. [USI] obtained a Florida judgment against MacGregor General Insurance Company, Ltd. [MacGregor]. USI then filed suit in the 141st District Court of Tarrant County, Texas, seeking preservation of MacGregor assets. Surety intervened in these proceedings and moved for interpleader, claiming that some of the assets at issue in the *MacGregor* proceeding, specifically $599,819.98, included funds allegedly on deposit with Surety in some of the same accounts involved in the Tennessee proceedings against Anchorage. (Plaintiff's Consolidated Motion, Exhibit 4, at 7–8; Appendix to Defendant's Motion for Summary Judgment, Ex. 12, at 360). In the intervention, Surety named Anchorage and the Receiver as defendants. Pursuant to an order of the court, Surety paid approximately $600,000 into the registry of the court to be held pending resolution of the conflicting claims and asked that the Bank be discharged from all liability with respect to the conflicting claims. (Appendix to Defendant's Motion for Summary Judgment, Ex. 3, at 22).

The Receiver moved to stay or dismiss the USI interpleader suit, claiming that the Tennessee liquidation court had exclusive jurisdiction over Anchorage's property wherever located and that the Texas court should give full faith and credit to the Liquidation Order. The Texas district court denied the Receiver's motion and entered a summary judgment awarding the interpleaded funds to USI. (*Id.* at 362).

The court also held that the Surety's intervention and interpleader were proper. (*Id.*).

On October 31, 1996, the Court of Appeals for the Second District of Texas, sitting at Fort Worth, affirmed the district court in part and reversed in part. [*Bryant I*]. In its opinion, the court held that the Liquidation Order showed on its face that it had been entered in excess of the Tennessee court's jurisdiction, and, therefore, the district court did not err in refusing to give full faith and credit to the order. The court also affirmed the propriety of the Bank's intervention. Finding that a factual dispute remained as to who owned the disputed funds, though, the court remanded the case to the district court for resolution of fact issues. (*Bryant I*, Defendant's Response to Motion for Summary Judgment, Ex. A1).

The Receiver filed an application for writ of error seeking review in the Texas Supreme Court. The supreme court granted the application. On May 8, 1998, the court affirmed the court of appeals; however, the supreme court based its decision on a different rationale from that of the court of appeals. Regarding the Tennessee court's jurisdiction and the full faith and credit issue, the court stated as follows:

> ... we have no difficulty in stating that, had the Bank or USI proceeded against Anchorage or the [Receiver], the full faith and credit clause may very well have necessitated dismissal of such a suit.... What is overlooked in the parties' and the amicus's arguments about the full faith and credit clause, however, is the fact that the action at issue—the Bank's interpleader of funds, the ownership of which is in dispute—is not within the scope of the Tennessee liquidation order.

> We need not decide in this case whether [the Tennessee Act] authorizes the Tennessee chancery court to order the Receiver to marshal Anchorage assets located outside of Tennessee. [foot-

note omitted]. In this case, there has been no adjudication, in Texas or in Tennessee, that the funds at issue belong to Anchorage. [footnote omitted]. The liquidation order incorporates the conservation order, which by its terms applies to Anchorage's property. Thus, even if we assume that the Tennessee court had jurisdiction over Anchorage assets located in other states, we are still left with the fact that we do not yet know if the funds at issue even are Anchorage assets.

*Bryant v. United Shortline Inc. Assurance Services (Bryant II)*, 972 S.W.2d 26, 28–29 (Tex.1998) (citations and footnotes omitted). In a footnote, the court expressly refused either to approve or disapprove the court of appeals' finding that the Tennessee Act precludes the Tennessee chancery court from exercising jurisdiction over Anchorage assets located outside of Tennessee. *Id.* at n. 1.

### C. The Present Suit

The plaintiff filed the present action on May 10, 1995, claiming title not only to accounts 1009216, 1008855, and 1007848, but also to three others: (1) account # 1010644, called the "Anchorage/MacGregor Operating Account;" (2) account # 1011824, called the "Surety Premium Finance Reserve Account II," which the plaintiff claims was established on March 4, 1993, and represents payments made by Anchorage policyholders after conservation and receivership proceedings had been commenced; and (3) account # 1011063, which is called "Surety Premium Finance Reserve Account," and which the plaintiff claims was created simultaneously with 1011824. The plaintiff alleged that 1011824 was established by the Bank three days after the entry of the federal temporary restraining order for the purpose of circumventing that order. (Complaint ¶¶ 30–31). According to the plaintiff, the Bank intentionally violated the Tennessee court orders and committed fraudulent transfers, preferential transfers, common law conversion, common law

fraud, negligence, and bad faith. (*Id.* ¶¶ 33–40).

The plaintiff filed a motion for summary judgment, arguing that no genuine issues of material fact remained as to his allegations and that judgment should be entered in his favor. The defendant responded and filed a motion for summary judgment of its own, in which it claims that this court is bound by the Texas Court of Appeals' decision that the Tennessee court lacked jurisdiction over property in Texas. The Bank also argues that the Receiver had no jurisdiction over property outside Tennessee. Finally, the defendant argues that the Full Faith and Credit Clause does not require enforcement of the Tennessee judgment in Texas, because the Tennessee court lacked jurisdiction over the Texas property.

### II. STANDARD OF REVIEW

A motion for summary judgment shall be granted when, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party "may not rest upon mere allegation or denials of his

pleading, but must set forth specific facts showing that there is a genuine issue for trial" and "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505 (citations omitted).

## III. LEGAL ANALYSIS

### A. Summary of Claims and Defenses

The resolution of the claims and defenses of this case, considering its procedural posture and its companion cases in Texas and Tennessee state courts, requires careful maneuvering through several judicial doctrines. Most particularly, the case presents issues of state law interpretation, full faith and credit, the *Erie* doctrine, and res judicata. Briefly, the chief claims and defenses are as follows.

The plaintiff asserts that he, as receiver, is entitled to two groups of funds: those transferred from Anchorage accounts preceding the three Tennessee court orders and those funds transferred after March 1, 1993, when the first of the Tennessee orders was issued. (*See generally* Brief in Support of Plaintiff's Motion for Summary Judgment). Concerning the monies transferred between January 1, 1993, and February 28, 1993, the plaintiff relies on the fraudulent transfer and preferential transfer sections of the Tennessee Insurers Rehabilitation and Liquidation Act, Tenn. Code Ann. §§ 56–9–315 and 56–9–317. Under the Act, the Commissioner of Commerce and Insurance, once appointed as Liquidator of a particular insurer, has the power to avoid preferential and fraudulent transfers as those terms are defined in the Act. Tenn.Code Ann. § 56–9–310(a)(21). With regard to the monies transferred on and after March 1, 1993, the plaintiff argues that he is entitled to compensation for such transfers because they were made in violation of the Tennessee state and federal orders. Also, the plaintiff argues that the defendant's transfer of funds was

fraudulent and constituted conversion because they were made in violation of the Tennessee court orders. (*See* Plaintiff's Summary Judgment Brief at 39–41). In essence, the plaintiff requests enforcement of the Tennessee orders based on the Full Faith and Credit Clause.

The defendant counters that full faith and credit does not apply in this case because the Tennessee courts lacked jurisdiction over Anchorage property located outside of Tennessee. In fact, the defendant argues that, under the *Erie* doctrine, I *must* reach that conclusion, because a Texas court of appeals already has held that Tennessee lacked jurisdiction over Anchorage property located in Texas.

The plaintiff responds that the Tennessee court's determination that it had subject matter jurisdiction itself is entitled to full faith and credit, thus trumping the *Erie* doctrine and requiring enforcement of the Tennessee orders.[4]

### B. Discussion

The plaintiff's claims arise solely from the rights obtained in the Tennessee court orders. Thus, enforcement of those rights depends upon whether the Tennessee orders are entitled to full faith and credit. The Full Faith and Credit Clause provides:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. Const. Art. IV, § 1. Under the power granted by the clause, Congress created the following law:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as

---

**4.** Although the parties present several other legal theories in support of their positions, I find that I need not address those alternative

theories, because the *Erie* issues will resolve the case in its entirety.

they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738.[5]

■ These mandates only apply, though, if the state court issuing judgment had jurisdiction to enter such a judgment. *See Baker by Thomas v. General Motors Corp.,* 522 U.S. 222, 231–32, 118 S.Ct. 657, 663–64, 139 L.Ed.2d 580 (1998); *Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 76, 60 S.Ct. 44, 84 L.Ed. 85 (1939). On that basis, the defendant argues that this court is not bound to follow the Tennessee judgments, because the Tennessee statute under which the liquidating court claimed its power only authorizes liquidation of non-domiciliary companies' property located in Tennessee. *See* TENN.CODE ANN. § 56-9-402(a) ("If no domiciliary receiver has been appointed, the commissioner may apply ... for an order directing the commissioner to liquidate the assets *found in this state* of a foreign insurer or an alien insurer not domiciled in this state....") (emphasis added). Moreover, the defendant asserts that, since a Texas court already has found that Tennessee lacked jurisdiction over Anchorage property in Texas, I must follow the Texas court's interpretation of Tennessee law.

The principle of law announced in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is fairly simple to state, though its simplicity is tested in application: because there is no federal "general" common law, federal courts sitting in diversity cases must follow state law. *Erie,* 304 U.S. at 78, 58 S.Ct. 817. Typically, the federal court is to apply the state law of the state in which the federal court sits. *See Klaxon v. Stentor Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court in Delaware must apply Delaware's conflict of law rules). The case presently before me,

however, strays from the normal *Erie* factual scenario. In this case, this court—a federal court sitting in Texas—is asked to enforce Tennessee statutes and decisional law. The issue I must determine, then, is how to follow *Erie* when the law I am to interpret is not that of the forum state.

■ Problems such as this one most closely resemble *Erie* cases in the conflicts of law area. The Supreme Court has found that, in determining which state law applies in a conflicts case, the federal court must follow the conflicts of law rules of the forum state. *See Klaxon,* 313 U.S. at 496, 61 S.Ct. 1020. If, in examining the forum state's conflicts rules, the federal court determines that another (the "foreign") state's law applies, the question remains whether the federal court follows the foreign state's law as the *foreign* state would apply it or as the *forum* state would apply it. Stated most simply with the facts of this case, the issue is whether this federal court in Texas is to apply Tennessee law as Tennessee would interpret it or as Texas has interpreted it.

Although I have not located another case in which the court was faced with the exact problem in this case, I have located factually similar cases. If those cases are correct, I am to apply Tennessee law as the Texas court interprets it. In a now-famous observation in the Second Circuit, Judge Friendly noted the apparent feat that *Erie* required in a similar setting:

Our principal task, in this diversity of citizenship case, is to determine what the New York courts would think the California courts would think on an issue about which neither has thought.

*Nolan v. Transocean Air Lines,* 276 F.2d 280, 281 (2d Cir.1960), *judgment set aside on other grounds,* 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961), *modified,* 290

---

5. By its terms, the Full Faith and Credit Clause applies only to states. Thus, under the clause alone, this court is under no obligation to recognize state judgments. However, the Full Faith and Credit Clause gives Congress the power to enact laws effecting its purpose, and through this power Congress enacted the Full Faith and Credit Act, 28 U.S.C. § 1738. This Act requires that federal courts grant full faith and credit to state judgments. *See* JAMES WM. MOORE ET AL, 18 MOORE'S FEDERAL PRACTICE §§ 133.02[1][b], 133.02[2][b] (3d ed.1998).

F.2d 904 (2d Cir.1961). The Supreme Court did set aside the *Nolan* judgment because of a California Supreme Court opinion that was handed down shortly after the Second Circuit opinion was drafted; however, the Court did not question Judge Friendly's summary of the proper analysis. In fact, the Supreme Court directed the Second Circuit to consider, in light of the new California Supreme Court opinion, "what relative weights ... the New York Court of Appeals would accord to the [California authority]." *Nolan,* 365 U.S. at 295–96, 81 S.Ct. 555.

Since the *Nolan* opinions were published, many courts, including the Fifth Circuit, have borrowed, paraphrased, and quoted Judge Friendly's analysis. *See Allstate Ins. Co. v. Employers Liability Assurance Corp.,* 445 F.2d 1278, 1278 (5th Cir.1971) ("In one of those extraordinary bits of diversity mysticism, we must perform the occult multiple feats of divining whether the district court correctly predicted what a Florida court would determine an Illinois court would decide on a question which the courts of Illinois have not yet squarely faced."); *Beck v. Pennsylvania National Mutual Casualty Insurance Co.,* 429 F.2d 813, 816 (5th Cir.1970) (citing Judge Friendly's comment in *Nolan* ) ("We must therefore prognosticate what a Florida judge would think a Pennsylvania judge would think about a question that Pennsylvania judges have not thought about."); *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) ("We are therefore obliged to engage in the uncertain task of predicting what the New York courts would predict the Oregon courts would rule as to the contours of a right of publicity under Oregon law."); *Transit Casualty Co. v. Transamerica Ins. Co.,* 387 F.2d 1011, 1015 n. 9 (8th Cir.1967) (citing *Nolan* ) ("Indeed, there is authority holding that where the forum state would apply foreign law, the federal court is not to look directly to that foreign law but rather is to determine how the forum state would interpret the foreign law."); 19 CHARLES ALAN WRIGHT, ARTHUR MILLER, & EDWARD H.

COOPER, FEDERAL PRACTICE & PROCEDURE § 4506.

■ Unlike these cited cases, where the federal court must guess at how the forum court would interpret the foreign law, I have clearer guidance about the mindset of Texas state courts on this issue: a Texas court of appeals already has found that the Tennessee court has no jurisdiction over Anchorage's Texas property. *See Bryant I,* Defendant's Response to Plaintiff's Motion for Summary Judgment, Ex. A1. Therefore, under the doctrine so applied, it appears that this court should find that the Tennessee court lacked jurisdiction.

The plaintiff posits several arguments to convince me of the error of this analysis. First, the plaintiff argues that the Texas Court of Appeals' holding is not binding on this court because of the subsequent decision in the Texas Supreme Court in *Bryant II.* The plaintiff asserts that the Texas Supreme Court expressly vacated the court of appeals' holding. However, I have located no language in the supreme court opinion vacating the court of appeals' opinion. The court did affirm on different reasoning from the court of appeals, but the supreme court said that it *"need not decide* ... whether [the Tennessee Act] authorizes the Tennessee chancery court to order the Liquidator to marshal Anchorage assets located outside of Tennessee," and expressly stated that it *"neither approve[s] nor disapprove[s]* the court of appeals' finding that [the Tennessee Act] precludes the Tennessee chancery court from exercising jurisdiction over Anchorage assets located outside of Tennessee." *Bryant II,* 972 S.W.2d 26, 29 & n. 1 (Tex. 1998) (emphasis added).

■ In addition, the United States Supreme Court has held that "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Tel & Tel*

*Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940). The Texas Supreme Court, in its opinion, gave no indication that it would reach a conclusion different from that of the court of appeals. Although the United States Supreme Court has noted that the decisions of lower state courts, while entitled to some weight, are not controlling where the highest court of the state has not spoken on the issue, *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (citations omitted), the Texas Court of Appeals' decision is the strongest—and the only—basis I have for interpreting how Texas would interpret the Tennessee law.[6]

■ Next, the plaintiff argues that the *Erie* doctrine does not apply in this case because the laws at issue, the Full Faith and Credit Clause and Full Faith and Credit Act, are matters of federal law; *Erie*, on the other hand, does not apply in federal statutory or constitutional matters. *See Erie*, 304 U.S. at 78, 58 S.Ct. 817 ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State"). Although I agree that full faith and credit is a federal constitutional and statutory issue, the underlying issue in this case is whether subject matter jurisdiction existed so as to allow full faith and credit to apply. The question of whether Tennessee had subject matter jurisdiction over Anchorage assets in Texas is purely a matter of interpretation of the Tennessee statute. It is, then, a matter of substantive state law and therefore is subject to the *Erie* doctrine.

Finally, the plaintiff directs my attention to a United States Supreme Court in which the Court found that a state's determination that it has subject matter jurisdiction in a particular case is itself entitled to full faith and credit. *Underwriters National Assurance Co. v. North Carolina Life and Accident and Health Insurance Guaranty Assoc.*, 455 U.S. 691, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982), is factually very similar to this case. An Indiana court oversaw a rehabilitation/conservatorship/liquidation of Underwriters National Assurance Company [Underwriters], an Indiana insurance company. Underwriters also did business in North Carolina, which had required.Underwriters to post a $100,000 bond for North Carolina policyholders when its solvency became questionable. The North Carolina Association protecting North Carolina insureds was allowed to participate in the Indiana process, including the drafting and modification of a rehabilitation plan. When the Indiana court adopted the final plan, it found, *inter alia*, that it had "jurisdiction over the subject matter and over the parties, including all [Underwriters'] policyowners ... [and] state insurance guaranty associations." *Underwriters*, 455 U.S. at 699–700, 102 S.Ct. 1357.

---

6. The plaintiff argues that, of the four Texas state and federal court opinions addressing the Tennessee orders, all but one—the *Bryant I* opinion of the Texas Court of Appeals—upheld the Tennessee court's jurisdiction to issue its orders. The other opinions cited by the plaintiff are: *State of Tennessee, ex rel., Sizemore v. Surety Bank*, 939 F.Supp. 511 (N.D.Tex.1996) (Fitzwater, J.) (deciding the motion to dismiss in the present case); *Bryant v. Shields, Britton & Fraser*, 930 S.W.2d 836 (Tex.App.—Dallas 1996, no writ); and *Bryant II*, 972 S.W.2d 26 (Tex.1998). The plaintiff's argument is faulty though. Closer examinations of these opinions demonstrates the errors.

    While Judge Fitzwater declared in his opinion on the motion to dismiss in this case that "Surety's jurisdictional argument is without merit," 939 F.Supp. at 514, Judge Fitzwater made this declaration without any guidance from the Texas state courts on how they would rule on the issue. Therefore, Judge Fitzwater did not have the restrictions under *Erie* that I must consider now after issuance of the *Bryant* opinions. The *Shields* opinion cannot support the plaintiff's argument because the opinion never addresses the jurisdiction issue. Finally, the Texas Supreme Court's *Bryant II*, opinion, as I already have noted, expressly declined to address the jurisdiction issue. Therefore, the only direct expression of the Texas courts on the pertinent issue is the Texas Court of Appeals' opinion in *Bryant I*.

Later, Underwriters and the North Carolina Association had a dispute concerning the $100,000 bond that had been posted with North Carolina. The North Carolina Association then filed suit against Underwriters in North Carolina to address this disagreement. The North Carolina court found that the Indiana court had no subject matter jurisdiction over the $100,000 bond, and therefore refused to honor the Indiana judgment. Based on this finding, the North Carolina court ordered the North Carolina Insurance Commissioner to liquidate the $100,000 bond to satisfy pre-rehabilitation claims of North Carolina policyholders. After appealing the matter through the North Carolina appellate process, Underwriters took the matter to the United States Supreme Court.

The Supreme Court held that a sister state "may inquire into the jurisdictional basis of the foreign court's decree" in deciding whether to grant full faith and credit to the foreign court's judgment. *Underwriters*, 455 U.S. at 705, 102 S.Ct. 1357. However, if the foreign court had determined that it had subject matter jurisdiction, that determination itself is entitled to full faith and credit:

> [T]his Court held that "a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." [footnote omitted]. The North Carolina courts, therefore, should have determined in the first instance whether the Rehabilitation Court fully and fairly considered the question of subject matter jurisdiction over the North Carolina deposit, with respect to pre-rehabilitation claims of the parties before it. If the matter was fully considered and finally determined in the rehabilitation proceedings, the judgment was entitled to full faith and credit in the North Carolina courts.

*Id.* at 706–707, 102 S.Ct. 1357 (quoting *Durfee v. Duke*, 375 U.S. 106, 111, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963)).

■ Because the Tennessee Rehabilitation court stated in its orders that it had subject matter jurisdiction over the case, (*see* Plaintiff's Motion for Summary Judgment, Ex. D ¶ 1 and Ex. E ¶ 1), the plaintiff argues that *Underwriters* requires me to apply full faith and credit to those findings. However, this case is factually distinguishable from *Underwriters* in a few key aspects. First, even were I to apply the rationale of *Underwriters* to this case, it is far from clear that the Tennessee court "fully and fairly litigated" the question of whether it had subject matter jurisdiction so as to require the application of full faith and credit. In the orders in which it declares that it has subject matter jurisdiction, the Tennessee court simply states that it has jurisdiction under sections 56–9–401 and 56–9–402 of the Tennessee Insurers Rehabilitation and Liquidation Act. (Plaintiff's Motion for Summary Judgment, Exhibit D, ¶ 1, and Exhibit E, ¶ 1). The court fails to examine the limiting phrases of section 56–9–402(a) that seem to give the court only limited jurisdiction over "assets found *in this state.*" *See* Tenn.Code Ann. § 56–9–402(a). Furthermore, I have seen no evidence that the subject matter jurisdiction of the court was ever contested by the parties or examined closely by the Tennessee court.

■ In addition, even if the analysis of *Underwriters* is applicable to this case, the plaintiff fails to recognize the significance of the procedural posture of this case as compared to that in *Underwriters*. In *Underwriters*, the parties appealed directly to the United States Supreme Court after the North Carolina courts had a full opportunity to decide the jurisdiction issue at all trial and appellate levels. In other words, the Supreme Court acted as a direct reviewer of the North Carolina court's decisions, which is a task within the Court's power. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923). This court, by contrast, has no power to question the wisdom or

validity of a Texas state court's determination of state law. *See id.* ("Under the legislation of Congress, no court of the United States other than [the Supreme Court] could entertain a proceeding to reverse or modify the judgment for errors [from the state court]"). This court does not sit above the Texas courts as a reviewing court; when it sits in a diversity case, it sits merely as an extension of Texas state law.

A decision by me that Tennessee had jurisdiction over Anchorage property in Texas would, by implication, act as a determination that the Texas Court of Appeals erred. This is a determination I think I cannot make and one which the *Erie* doctrine cautions against making. In fact, the possibility that I may issue a decision conflicting with the Texas Court of Appeals' decision is precisely the evil sought to be quelled by the *Erie* doctrine. One of the fundamental rationales for *Erie* was the discouragement of inconsistent law within a state. *See Erie,* 304 U.S. at 75, 58 S.Ct. 817 (discussing the inequality within a state caused by application of a general federal common law). The Court has repeatedly expressed its desire that federal courts not create inconsistent state law:

> The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal instead of in a State court a block away, should not lead to a substantially different result.

*Van Dusen v. Barrack,* 376 U.S. 612, 638, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (quoting *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). *See also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496,

61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (noting the "principle of uniformity within a state upon which the *Tompkins* decision is based."). Never was the necessity for that policy more clearly underscored than in this case. A decision by me in favor of the plaintiff may directly conflict with a decision in the Texas *USI* interpleader case, which still is pending and in which some of the same property is at issue. If the plaintiff is dissatisfied with the outcome in that case, he has remedy yet either through the linear appellate process or by seeking enforcement of the Tennessee injunction in the Tennessee court.[7]

This result also complements common enforcement practices in the courts. The defendants made the forceful argument that this court lacks jurisdiction to enforce the Tennessee orders, because suits for violation of injunctions can only be brought in the court that issued the original injunction. (*See* Def's brief in support of motion for summary judgment, at 27) (citing *Klett v. Pim,* 965 F.2d 587, 591 (8th Cir.1992)). While I decline to rule on the issue of whether this court lacks jurisdiction to enforce another court's injunction, I note that the Supreme Court has recognized that sanctions for a violation of an injunction "are generally administered by the court that issued the injunction." *Baker v. General Motors Corp.,* 522 U.S. 222, ——, 118 S.Ct. 657, 665, 139 L.Ed.2d 580 (1998) (citing *Stiller v. Hardman,* 324 F.2d 626, 628 (2d Cir.1963), in which Second Circuit found that enforcement of injunction was properly left to issuing forum, regardless of where violation occurred). *See also id.* 118 S.Ct. at 665 ("Enforcement measures do not travel with the sister state judgment as preclusive effects do; such mea-

7. At this point I am unaware whether the Tennessee court even has been confronted directly with an argument about its power over the property at issue in this case, and although the Texas courts have directly addressed the issue at the district and intermediate appellate levels in the *Bryant* case, that case is making its second run through the court system on remand from the Texas Su-

preme Court; thus, the jurisdiction issue could feasibly be addressed again in the future in the Texas case. *See Bryant II,* 972 S.W.2d 26, 30 (noting that *"unless and until* such a determination is made [that the assets belong to Anchorage], the Tennessee order does not apply;" remanding for a determination whether the assets belong to Anchorage (emphasis added)).

sures remain subject to the even-handed control of forum law.") (cites omitted).

Therefore, I think the most reasoned resolution of this matter, then, is to follow what the Texas courts have said the result should be. Under Texas's interpretation of the Tennessee law, the Tennessee court had no jurisdiction over Anchorage property in Texas, and full faith and credit need not be afforded the Tennessee orders. In following the Texas Court of Appeals' holding on the jurisdiction issue, I do not express an opinion on the wisdom or legal accuracy of the Texas court's decision. Under the *Erie* doctrine, a federal court must follow a state's law regardless of the court's agreement or disagreement with that state's decisions. At its heart my ruling simply reflects the limited role federal courts take in diversity actions and in resolving conflicts between states.