**IN THE COURT OF APPEALS OF IOWA**

No. 22-1915
Filed November 8, 2023

**IN THE INTEREST OF M.B.,**
**Minor Child,**

**N.P., Mother,**
    Petitioner-Appellee,

**J.B., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Emmet County, Ann M. Gales, District Associate Judge.

A father appeals the termination of his parental rights under Iowa Code chapter 600A and the juvenile court's order finding Iowa has jurisdiction. **AFFIRMED.**

Michael H. Johnson, Spirit Lake, for appellant

Michael L. Sandy and Alexandria Celli Smith of Sandy Law Firm, P.C., Spirit Lake, for appellee.

Kayla Evans Olson of Pelzer Law Firm, Estherville, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Buller and Langholz, JJ.

**TABOR, Presiding Judge.**

Julian and Natalie[1] are the parents of seven-year-old M.B. Julian lives in Colorado while Natalie lives in Iowa with M.B. Natalie petitioned the court to terminate Julian's parental rights under Iowa Code chapter 600A (2020). Julian challenged the Iowa court's jurisdiction to do so, arguing Colorado did not allow for private terminations so the proceedings violated the Full Faith and Credit Clause and the Fourteenth Amendment of the United States Constitution.

The juvenile court found that Iowa had jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and that the proceedings did not violate the father's constitutional rights. It also found that Natalie met her burden under chapter 600A and terminated Julian's parental rights. Julian revisits the constitutional issues on appeal. He also argues the juvenile court lacked clear and convincing evidence to terminate his parental rights.

We first find that Iowa has jurisdiction under the UCCJEA and these proceedings did not violate Julian's constitutional rights. Then, like the juvenile court, we find that Julian financially abandoned M.B. and that termination of his parental rights is in M.B.'s best interests.[2]

---

[1] The parents' names are not Julian and Natalie. But for clarity and readability, we have assigned randomly generated pseudonyms rather than use their real first names or initials. *See* Iowa Ct. R. 21.25; Random Word Generator, https://randomwordgenerator.com/name.php.

[2] When a parent petitions the court requesting termination of the other parent's rights, Iowa Code chapter 600A guides our analysis. *In re Q.G.*, 911 N.W.2d 761, 769 (Iowa 2018). We call this a private termination, and we review the proceedings de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). We are not bound by the trial court's findings of fact, but we do give them weight "especially when considering the credibility of witnesses." *Id.* We also review constitutional claims and jurisdictional issues de novo. *See In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct.

## I. Facts and Prior Proceedings

Julian and Natalie were both eighteen years old and lived together in Colorado when M.B. was born. They were never married but resided with Julian's parents from roughly ages fifteen to nineteen.[3] In 2017, eleven months after M.B.'s birth, Julian assaulted Natalie. She called the police, and they arrested Julian for domestic abuse. He was convicted of assault in the third degree and sentenced to two years' probation. The young parents separated following that event.

After the assault, Natalie took M.B. to visit her mother and siblings in Reno, Nevada; and she never returned to Colorado. Before she left the state, Julian filed a custody petition. In 2018, the Colorado court entered an order allocating parental responsibilities. The order named Natalie as the "primary residential custodian" and granted Julian two weeks of parenting time with M.B. every two months. In 2019, Natalie asked the Colorado court for permission to relocate to Iowa with M.B., and the judge set the matter for hearing.

That November, Julian consented to Natalie relocating to Iowa with M.B—a twelve-hour drive from Colorado compared to the sixteen-hour drive to Nevada. Natalie and M.B. moved to Iowa with Natalie's boyfriend whom she met in Reno.[4] With the residence change, the Colorado court approved a modified parenting plan allowing Julian visitation the first weekend of every month. Julian also had time

---

App. July 22, 2020) (constitutional claims); *In re J.M.*, 832 N.W.2d 713, 719 (Iowa Ct. App. 2013) (jurisdictional claims).

[3] Natalie had been living in Colorado with her father but moved in with Julian and his parents at the age of fifteen or sixteen—when her father's girlfriend moved into their house and he "wasn't able to financially support her, her stepsister, himself and his [girlfriend] at the time."

[4] Natalie and her boyfriend are still together, living in Estherville with M.B.

with M.B. for one month in the summer, one week during winter break, and half of all holidays. Julian and Natalie were to share responsibilities of travel, but if child support[5] was not paid that month, then Julian would cover Natalie's travel costs. Julian could also speak to M.B. on the phone anytime between 4 p.m. and 7 p.m. Monday through Friday, and 12 p.m. to 7 p.m. on weekends.

Since the parents' separation in 2017, Julian has been jailed for various offenses, including driving under the influence and violating his probation. From May 2018 to September 2019, Julian exercised visitation with M.B. three times, each for two weeks. At times, Natalie would withhold M.B. from Julian if she did not feel comfortable with his criminal activity or was unhappy with his communication. Meanwhile, Julian's phone contact with M.B. was sparse. Julian often missed the window of opportunity to call M.B. and would demand to talk to her on the spot at random times. In 2019, Julian asked if M.B. could be the flower girl in his brother's wedding in Colorado. At first, Natalie consented. But she revoked her consent at the last minute when she was uncertain whether Julian would pay for the flight.

Between October 2019 and September 2020, Julian had a single visit with M.B. lasting one week. He also had video chats with her through Facebook Messenger from October through December 2019. After that, his probation was revoked, and he was incarcerated from December 2019 until September 2020. During those nine months, Julian only called M.B. three times in August 2020.

---

[5] Echoing the termination order, it appears the support obligation was originally set at $535 per month but later modified to $416 per month.

Natalie refused to allow video visits from the jail. And Julian did not send gifts or letters to M.B., worried that they "would go into the trash."

In April 2020, Natalie petitioned to terminate Julian's parental rights.[6] Julian moved to dismiss the action in Iowa and move it to Colorado. In July 2020, the Iowa juvenile court held a hybrid hearing on jurisdiction. As contemplated under the UCCJEA (section 14-13-110 of the Colorado Revised Statutes Annotated and Iowa Code section 598B.110), the Iowa court conferenced with the Colorado judge who issued the original custody order involving M.B. Julian's attorney argued Colorado was a more appropriate forum and noted that Colorado law differs from Iowa's statutes on termination of parental rights.[7] But the Colorado judge declined to exercise jurisdiction based on the factors in section 14-13-207 of the Colorado Revised Statutes. The Colorado judge stated: "I believe [Iowa is] now the home state, and I do not have jurisdiction." The Iowa court then denied the father's motion to dismiss.

At the termination hearing in the spring of 2021,[8] Natalie testified that M.B. did not view Julian as an important person in her life. By contrast, Julian testified that he had always been involved in M.B.'s life. He estimated that between September 2020 and February 2021, he video conferenced with M.B. around "forty

---

[6] Julian's communication with M.B. picked up slightly after Natalie filed the petition. He called M.B. a few times each month until February 2021. That February, Julian did not call. With Julian's silence, Natalie disabled her Facebook Messenger, and Julian was no longer able to video chat with M.B. by that means.

[7] The Colorado judge explained that his state did not "have such creature as a private termination." In Colorado, the only way for a party other than the State to petition for termination is for purposes of stepparent adoption under Colorado Revised Statute 19-5-203(1)(d)(ii).

[8] The hearing was held over two days in March and one day in May.

plus" times, "maybe more." Julian's mother testified that Julian was "missing out" on being a father to M.B., but "it's not from lack of trying." In a report to the court, the guardian ad litem (GAL) wrote: "[M.B.] is thriving in the care of Natalie. The only life [M.B.] has ever known has been that with Natalie and sporadic contact with Julian. The history of Julian's behavior shows that he will not be a consistent nor safe presence in [M.B.'s] life."

In November 2022, the juvenile court entered an order terminating Julian's parental rights. Julian appeals.

## II. Analysis

### A. Jurisdiction and Constitutional Challenges

Julian argues that the termination of his parental rights by an Iowa court violated his constitutional rights as a Colorado citizen. He alleges violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, Section I, of the United States Constitution. Driving his argument is what he calls the "striking" difference between Colorado and Iowa when it comes to termination actions. Iowa Code chapter 600A allows one parent to petition the juvenile court to terminate the rights of the other parent. By contrast—as Julian describes it—Colorado "requires a stepparent to initiate such a case and does not allow for private termination actions outside of the adoption arena." He contends that as a parent living in Colorado, his rights should be protected by Colorado law. Julian recognizes that courts generally look to the UCCJEA to settle interstate battles over termination of parental rights. But he contends that "[n]othing in the UCCJEA should be read to violate a parent's equal protection and due process rights."

While Julian constructs creative theories for reversal, we find them unpersuasive. His argument cannot succeed because it contradicts itself. He contends that the termination petition should be dismissed because Iowa did not have jurisdiction to decide his parental rights. Yet he insists his issue is "not based on applicability of the UCCJEA rules." Both things can't be true. The UCCJEA provides "the exclusive jurisdictional basis for making a child-custody determination by a court of this state." Iowa Code § 598B.201(2); *In re Marriage of Del Real*, 948 N.W.2d 542, 544 (Iowa Ct. App. 2020). Child custody proceedings include actions to terminate parental rights. Iowa Code § 598B.012(4). So any jurisdictional claim in this termination case starts and stops with the UCCJEA.

In denying his motion to dismiss, the juvenile court found that the UCCJEA was "akin to a choice of law statute." We agree. *See Crouch v. Smick*, 24 N.E.3d 300, 305 (Ill. App. 5th Dist. 2014) (comparing application of factors in UCCJEA to choice-of-law analysis). The UCCJEA addresses "situations in our increasingly mobile society where state courts are called upon to rule in matters involving children who have already been the subject of rulings in courts of another state." *In re Guardianship of T.H.*, 589 N.W.2d 67, 68 (Iowa 1999) (discussing the Uniform Child Custody Jurisdiction Act, predecessor to the UCCJEA). Its purpose is to "avoid jurisdictional competition and conflicts with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being." Unif. Child Custody Jurisdiction & Enforcement Act § 101 cmt. 1, 9 U.L.A. 474 (1999).

The Iowa court found that it could consider the termination petition after the Colorado court ceded continuing jurisdiction because Colorado was an

inconvenient forum. *See* Iowa Code § 598B.203; Colo. Rev. Stat. Ann. § 14-13-207 (listing inconvenient-forum factors).[9] We discern no error in those findings. Indeed, Julian does not contest the court's application of the inconvenient-forum factors under the UCCJEA. Rather, he rests his claim on "his constitutionally protected and fundamentally important interests as a parent."[10] True, both the United States Supreme Court and the Iowa Supreme Court have emphasized the fundamental nature of parental rights. *Santosky v. Kramer*, 455 U.S. 753–54 (1982); *Santi*, 633 N.W.2d at 317. But those cases do not speak to the question of jurisdiction.[11] Colorado's more restrictive law on private terminations aside, Iowa had proper jurisdiction under the UCCJEA. As the juvenile court stated, the UCCJEA is designed to answer the question of which state can best decide the case in the interest of the child. Under that analysis, Iowa was the proper forum.

---

[9] In resisting the motion to dismiss, the mother addressed those factors, arguing that her termination petition "would be better handled by an Iowa court due to the domestic violence between the parties, financial imposition, residence of the child, lack of objection to the forum, and the location of both attorneys."

[10] While Julian mentions the Equal Protection Clause in passing, he fails to formulate a full-fledged argument under its framework. Instead, he focuses on the substantive due process right to raise one's children. *See Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001).

[11] We do not read Julian's due process argument as a facial challenge to the constitutionality of Iowa Code chapter 600A. Rather, he contends the Iowa law is unconstitutional as "applied to a Colorado parent." But his only example of deprivation is to his daughter. He asserts that under Colorado law, "children cannot be deprived of a parent by termination . . . without an adoptive parent immediately assuming parental responsibilities." Like the juvenile court, we cannot find that Julien has standing to make this argument on his daughter's behalf. *See Alons v. Iowa Dist. Ct. for Woodbury Cnty.*, 698 N.W.2d 858, 864 (Iowa 2005) ("Even if the claim could be meritorious, the court will not hear the claim if the party bringing it lacks standing.").

Before moving to the merits, we briefly address Julian's argument under the Full Faith and Credit Clause.[12]  He argues that because Colorado allows private terminations only in adoption cases, the Iowa court cannot terminate his parental rights without violating the Full Faith and Credit Clause.  But that clause does not compel "a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."  *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998) (citation omitted).  Only "regarding judgments . . . [is] the full faith and credit obligation . . . exacting."  *Id.* at 233.  Because the Colorado and Iowa courts followed the UCCJEA in deciding jurisdiction, Julian cannot show that applying Iowa's statute on private terminations violated his rights under the Full Faith and Credit Clause.

## B. Termination of Parental Rights Under Chapter 600A

Terminating parental rights under Iowa Code chapter 600A involves a two-step process.  *B.H.A.,* 938 N.W.2d at 232.  First, we must determine whether a ground for termination has been met under section 600A.8.  *Id.*  Second, we must evaluate whether termination is in the child's best interests.  *Id.*  The parent requesting termination must offer clear and convincing evidence for both steps.  *Id.*  Evidence meets that test when we harbor no "serious or substantial doubts" as to the correctness of the legal conclusions drawn from it.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citation omitted).

---

[12] It states: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."  U.S. Const. art. IV, § I.

### *1. Ground for Termination—Abandonment*

Julian contends Natalie did not offer clear and convincing evidence that he abandoned M.B. under Iowa Code section 600A.8(3)(b).[13]  That statute consists of a "cash component" and a "contact component."  Natalie only needs to prove one of those two criteria.  *See In re G.D.*, No. 20-0984, 2021 WL 2126174, at *3 (Iowa Ct. App. May 26, 2021).  In other words, the cash component—requiring a parent to provide reasonable financial support for the child—acts as the "threshold element of 'substantial and continuous or repeated contact.'"  *In re S.A.*, No. 17-0859, 2018 WL 1182889, at *2 (Iowa Ct. App. March 7, 2018); *see also In re J.G.*, No. 21-1836, 2022 WL 2347775, at *3 (Iowa Ct. App. June 29, 2022) ("If Manuel abandoned J.G. under the financial-support prong, we need not consider whether Eliana prevented visitation or communication.").

Julian fails that threshold test for financial support.  Natalie testified in March 2021 that he was over $11,000 behind in child support.  He last made his court-

---

[13] To avoid a finding of abandonment, a parent must maintain

substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

(1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Iowa Code § 600A.8(3)(b).

ordered $416 monthly payment in April 2019. She also received his COVID-19 stimulus check in May 2020. Otherwise, he made no contributions to his daughter's support in two years.

By Julian's account, he has paid roughly $6,547 in child support since M.B.'s birth. He blames his recent nine-month incarceration for missed payments. He also emphasizes that his court fees from past violations interfere with his ability to pay child support. With this, he states that "the record is simply insufficient to determine what [he] was reasonably able to contribute." We disagree.

The record reflects Julian's lack of economic aid for M.B. both before and after that incarceration. As the juvenile court observed: "Even if [Julian's] incarceration provided a valid excuse for his failure to pay support during the nine months he was incarcerated, his abdication of his financial responsibilities for [M.B.] is longstanding and extends far beyond that nine-month period." The court noted that Julian had steady work from September 2020 to May 2021, so "there is no excuse for his failure to make *any* child support payments, however minimal, during this period—particularly with the termination trial looming." *See In re M.S.*, No. 20-0428, 2020 WL 4814168, at *3 (Iowa Ct. App. 2020) (noting that despite her meager income, mother could have contributed something to support her children). After our de novo review, we conclude that Julian has not contributed toward M.B.'s support in a reasonable amount given his means. This "cash component" alone shows Julian's abandonment of M.B.[14]

---

[14] Natalie chose not to argue termination under Iowa Code section 600A.8(4) which states termination is supported if "[a] parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause."

### *2. Best Interests of the Child*

Finally, we must consider whether termination is in M.B.'s best interests. *In re R.K.B.*, 572 N.W.2d 600, 602 (Iowa 1998). Iowa Code section 600A.1(2) states:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Granted, Julian has expressed a continued interest in M.B. He has kept in touch with Natalie about M.B. and often says he wants to see his daughter. But his actions have thwarted his best intentions. The last time M.B. saw Julian in person was in 2019. As for video or phone contact, Julian often misses scheduled times to talk to M.B. He makes excuses for why he cannot contact M.B. at a certain time. And when he does call, their communication is minimal. For instance, two of their four phone calls in January 2021 lasted one minute or less. *See In re M.A.*, No. 20-0520, 2020 WL 6480884, at *2 (Iowa Ct. App. Nov. 4, 2020) ("[T]hose [weekly] twenty-minute-long phone calls do not rise to the level of the father 'affirmatively assum[ing] the duties encompassed by the role of being a parent.'" (third alteration in original) (quoting Iowa Code § 600A.1(2)).

We have no doubt that Julian loves M.B. But he has missed many child support payments and continued to disobey the law, violate his probation, and land himself in jail. Because of his actions, he has let the duty of parenting fall heavily on Natalie and has allowed his bond with M.B. to slip away. *See B.H.A.*, 938 N.W.2d at 234 (finding that father's "chosen lifestyle was at the expense of a

relationship" with his child).  To that end, Natalie testified that the last time Julian called M.B., she showed little interest in talking to him.

Julian mentions examples of Natalie blocking his efforts to connect with M.B.  One point of contention was when Natalie revoked her consent to send M.B. to Colorado to be the flower girl in Julian's brother's wedding.  That incident was unfortunate.  But it does not overshadow the fact that Julian has not made a genuine effort to maintain a place of importance in M.B.'s life.  We credit the GAL's opinion that termination would be in M.B.'s best interests because of the sparse communication and her not being safe in Julian's presence.

In closing, we note the close relationship that has developed between M.B. and Natalie's boyfriend.  He has expressed his willingness to adopt M.B. after he and Natalie marry.  With these facts, we conclude that termination of Julian's parental rights is in M.B.'s best interests.

**AFFIRMED.**